894 So.2d 59 (2004)
Willie Seth CRAIN, Appellant,
v.
STATE of Florida, Appellee.
No. SC00-661.
Supreme Court of Florida.
October 28, 2004.
Rehearing Denied January 25, 2005.
*62 James Marion Moorman, Public Defender and Paul C. Helm, Assistant Public Defender, Tenth Judicial Circuit, Bartow, FL, for Appellant.
Charles J. Crist, Jr., Attorney General and Scott A. Browne, Assistant Attorney General, Tampa, FL, for Appellee.
PER CURIAM.
This is a direct appeal of convictions of first-degree murder and kidnapping and a sentence of death. We have jurisdiction.[1] For the reasons that follow, we conclude that the State presented legally sufficient evidence of first-degree felony murder based on kidnapping with intent to inflict bodily harm, and therefore affirm the murder conviction and the sentence of death.

I. FACTS AND PROCEDURAL HISTORY
Willie Seth Crain, a then fifty-two-year-old Hillsborough County fisherman and crabber, was charged with the September 1998 kidnapping and first-degree murder of seven-year-old Amanda Brown. At the time, Amanda was three feet, ten inches tall and weighed approximately forty-five pounds.
*63 The evidence introduced at trial establishes that on September 9, 1998, Crain's daughter, Cynthia Gay, introduced Crain to Amanda's mother, Kathryn Hartman, at a bar in Hillsborough County. Crain and Hartman danced and talked for four hours, until 1:30 or 2:00 in the morning, then went to Hartman's residence, a trailer located in Hillsborough County, where they remained for approximately thirty minutes. Amanda was spending the night with her father and was not present. However, two photographs of Amanda and some of her toys were visible in the trailer. Before Crain left, Hartman made it clear to Crain that she wanted to see him again.
The next afternoon, September 10, 1998, Crain returned to Hartman's trailer. Hartman testified that Crain smelled of alcohol and carried a cup with a yellow liquid in it. Amanda was present. Crain began talking to Amanda about her homework. He pulled some money out and told Amanda that if she got her homework right, he would give her a dollar. He eventually gave her two dollars. Crain and Amanda sat at the kitchen table playing games and working on her homework. At some point during the afternoon, Crain became aware that Amanda had a loose tooth. After wiggling the tooth, Crain offered Amanda five dollars to let him pull the tooth out, but she refused. Hartman testified that the tooth was not ready to be pulled out. Crain remained at Hartman's residence for approximately one hour. Before he left early in the afternoon, Crain accepted Hartman's invitation to return for dinner that evening.
Crain returned to Hartman's trailer shortly after 7 p.m. Crain still smelled of alcohol and carried the same or a similar plastic cup with a colored liquid. After dinner, Hartman and Crain played more games with Amanda. At some point, Crain mentioned that he had a large videotape collection and invited Hartman and Amanda to his trailer to watch a movie. Amanda asked if he had "Titanic," which she stated was her favorite movie. Crain stated that he did have "Titanic" and Amanda pleaded with her mother to allow them to watch the movie. Hartman was initially reluctant because it was a school night, but she finally agreed. Crain drove Hartman and Amanda approximately one mile to his trailer in his white pickup truck.
They began watching the movie in Crain's living room but were interrupted by a telephone call from Crain's sister. Crain said he did not get along with his sister and asked Hartman to speak to her. At the conclusion of a twenty- to twenty-five-minute phone conversation with Crain's sister, Hartman found the living room unoccupied. Hartman opened a closed door at the rear of the trailer without knocking, and found Amanda and Crain sitting on the bed in Crain's bedroom, watching the movie "Titanic." Both were dressed and Amanda was sitting between Crain's sprawled legs with her back to Crain's front. Crain's arms were around Amanda and he appeared to Hartman to be showing Amanda how to work the remote control. Hartman testified that although she was not overly concerned about what she observed at that time, she nevertheless picked Amanda up and sat Amanda beside her on the bed. Crain, Hartman, and Amanda then watched the movie together in Crain's bedroom. Crain testified at trial that they watched the movie in his bedroom because it was the only air-conditioned room in the trailer.
At some point in the evening, Amanda and Hartman used Crain's bathroom together. While they were in the bathroom, Hartman did not notice Amanda bleeding from any location that Hartman could observe. *64 Hartman did notice a blue cover on the back of the toilet seat. Amanda did not use the bathroom at any other time that evening.
At another point in the evening, Hartman asked Crain if he had any medication for pain. Crain offered her Elavil and Valium. He also offered her some marijuana, which she declined. Crain told Hartman that the Elavil would "really knock the pain out" and would make her sleep for a long time. Hartman elected to take five, five-milligram Valium tablets.[2] Crain took one Valium tablet.
Eventually, Hartman decided that it was time to leave. Crain drove Hartman and Amanda back to their residence and accompanied them inside. Amanda took a shower. While checking on Amanda during the shower and helping her dry off and get ready for bed, Hartman did not notice any sores or cuts on Amanda's body. According to Hartman, Crain suggested that Amanda should not go to sleep with wet hair, so Crain blow-dried Amanda's hair in Hartman's bathroom without Hartman present. According to Hartman, when Amanda went to sleep in Hartman's bed around 2:15 a.m., the loose tooth was still in place and it was not bleeding.
According to Hartman, she told Crain, who appeared to be intoxicated at that time, that he could lie down to sober up but she was going to bed. The time was approximately 2:30 a.m. Within five minutes of Hartman going to bed, Crain entered Hartman's bedroom and lay down on the bed with Hartman and Amanda. Hartman testified that she neither invited Crain to lie in her bed nor asked him to leave. Crain was fully clothed and Amanda was wearing a nightgown. Amanda was lying between Hartman and Crain.
Penny Probst, a neighbor of Hartman, testified that at approximately 12 midnight on September 10-11, 1998, she saw a white truck parked immediately behind Hartman's car in Hartman's driveway. In the early morning hours of September 11, Probst observed the truck parked at the side of Hartman's residence with the lights on and the engine running.[3] Probst heard the truck leave after about five minutes.
Hartman slept soundly through the night. When she awoke in her bed alone the next morning, she discovered that Amanda was missing. Hartman testified her alarm clock read 6:12 a.m. when she awoke. Hartman immediately called Crain on his cell phone. At that time, he was at the Courtney Campbell boat ramp in Hillsborough County loading his boat. He told Hartman that he did not know where Amanda was. Hartman then called the police and reported Amanda's disappearance.
At trial, the State presented the testimony of fisherman Albert Darlington, who witnessed Crain towing his boat into the Courtney Campbell loading area at approximately 6:15 a.m. on September 11, 1998. Darlington testified that Crain pulled up to the boat ramp and backed his boat trailer and truck into the water until the truck's front tires were halfway submerged. Crain then got out of his truck *65 and boarded his boat wearing what appeared to be a two-tone maroon shirt and dark slacks, and carrying what appeared to be a rolled-up item of clothing. Crain unhooked his boat and launched it in an overall "odd" manner. Darlington further testified that in the eighteen months prior to Amanda's disappearance, on two occasions Crain told Darlington that Crain had the ability to get rid of a body where no one could find it.[4]
At around 8:30 a.m. on September 11, Detective Mike Hurley located Crain in his boat in Upper Tampa Bay. Crain was dressed in "slickers" (rubber pants fisherman wear over their clothes), a blue t-shirt, and loafers. Crain and Hurley returned to the boat ramp in Crain's boat. On the ride back, Hurley noticed a small scratch on Crain's upper arm. At the boat ramp, Crain removed his slickers, revealing jeans with the zipper down. Hurley took Crain to the police station for questioning. Crain was cooperative but denied having anything to do with Amanda's disappearance.
At the police station, Detective Al Bracket interviewed Crain. Crain told Bracket that he left Hartman's house alone at about 1:30 in the morning,[5] went home and accidentally spilled bleach in his own bathroom. Crain claimed that he did not like the smell of bleach, so he spent four hours cleaning his bathroom from about 1:30 to 5:30 in the morning. Later in the same interview, Crain said he cleaned his bathroom with bleach, as was his custom, then cleaned the rest of the house until 5:30 a.m., at which time he left to go crabbing.[6]
During the questioning, Bracket noticed multiple scratches on Crain's arms and asked Crain how he got them. Crain claimed that he received the scratches while crabbing, but became defensive when Bracket asked him to demonstrate how the scratches were inflicted. Photographs of Crain's body were taken on the morning of September 11, 1998. A forensic pathologist testified at trial that the scratches on Crain's arms probably occurred within a few hours to a day before the photos were taken. Although the pathologist could not identify the source of the scratches with certainty, he testified that all but two of the scratches were more likely to be caused by the fingernails of a seven-year-old child than by another cause. The pathologist also testified that there was one cluster of small gouges on Crain's arm, and it was more likely that these gouges were caused by the small grasping hand of a child of about seven years of age than by another cause.
During a search of Crain's residence, Bracket noticed the strong smell of bleach and recovered an empty bleach bottle. Bracket testified that there were obvious signs of grime and dirt around the edges of the bathroom sink. A blue fitted rug that would go around the base of the toilet was found in Crain's dryer. Another detective applied Luminol, a chemical that reacts both with blood and with bleach, to Crain's bathroom. The detective testified that the floor, the bathtub, and the walls "lit up."
Bracket also recovered two pieces of toilet tissue from the inside rim of Crain's *66 toilet and observed what appeared to be a small blood stain on the seat of the toilet. The tissue pieces, the toilet seat, and the boxer shorts that Crain was wearing on the morning of September 11, 1998 were collected and analyzed for DNA evidence. A forensic scientist for the Florida Department of Law Enforcement (FDLE) testified at trial that two blood stains were found on the toilet seat, one blood stain was found on one of the pieces of toilet tissue,[7] and one blood stain was found on the boxer shorts. The FDLE forensic scientist testified that the blood stain on the boxer shorts and one of the stains from the toilet seat contained DNA consistent with the DNA extracted from personal items belonging to Amanda Brown. The second stain on the toilet seat and the stain on the tissue contained DNA consistent with a mixture of the DNA profiles of Amanda and Crain. Testimony established that the probability of finding a random match between the DNA profile on the boxer shorts and Amanda's known DNA profile is approximately 1 in 388 million for the Caucasian population.
Detective Hurley supervised an extensive, two-week search for Amanda in Upper Tampa Bay, the land surrounding Upper Tampa Bay (including the Courtney Campbell Causeway), and the land area surrounding the Crain and Hartman residences. Amanda's body was never found. The maroon shirt and dark pants that Darlington saw Crain wearing on the morning of September 11, 1998, also were never recovered.
At trial, the State introduced the testimony of Linda Miller, Maryann Lee, and Frank Stem. Miller and Lee, who were neighbors of Crain's daughter, Gay, testified about a conversation with Crain that occurred at Gay's home on the first Saturday after Amanda's disappearance. Miller and Lee both testified that Miller said to Crain, "Don't worry, you don't have anything to worry about," and "Just remember, you didn't do anything, you didn't hurt that little girl." According to the testimony of Miller and Lee, Crain responded, "Yes, I did do it; yes, you're right, I didn't hurt her, I didn't do anything." Gay testified that Crain said, stuttering, "yes, I did ... did... didn't do it; yes, you're right, I didn't hurt her."
Frank Stem, Crain's friend and in-law,[8] testified that about one month prior to Amanda's disappearance, Stem helped Crain lay crab traps in a "special" location. At that time, Crain told Stem that other crabbers would steal the crab traps if they knew of the spot. After Amanda disappeared and during a conversation regarding competing crabbers finding his crab traps, Crain told Stem that if Stem revealed the location of the traps "that it could bury him," meaning Crain, or that Stem had enough "evidence to bury him."
At the conclusion of the State's case, Crain moved for judgments of acquittal of first-degree murder and kidnapping based on the insufficiency of the evidence. The trial court denied Crain's motion. Crain then testified in his defense and denied that he was involved in Amanda's death. He stated that he last saw Amanda while she lay sleeping in her mother's bed in the early morning hours of September 11, 1998.
*67 On the first-degree murder charge in count I, the trial court instructed the jury on the dual theories of premeditated murder and felony murder based on kidnapping "with intent to commit or facilitate the commission of homicide or to inflict bodily harm upon the victim." On the kidnapping charge in count II, the court instructed the jury that the State had to prove that Crain acted "with intent to commit or facilitate the commission of a homicide." The jury found Crain guilty of first-degree murder on a general verdict form. The jury also found Crain guilty of kidnapping as charged. In the penalty phase, the jury unanimously recommended the death sentence. The trial court found three aggravators: (1) prior violent felonies (great weight), (2) the murder was committed during the course of a kidnapping (great weight), and (3) the victim was under the age of twelve (great weight). The court found no statutory mitigators and eight nonstatutory mitigators,[9] and imposed the death sentence.
Crain raises five issues on appeal: (1) the evidence was insufficient to establish that the murder of Amanda was premeditated; (2) the evidence was insufficient to establish an essential element of kidnapping, that Amanda was abducted with the intent to commit or facilitate commission of a homicide; (3) the trial court committed fundamental error by giving different jury instructions in the felony murder and kidnapping counts as to the elements of kidnapping; (4) the kidnapping conviction relied on by the State for an aggravating circumstance was not supported by the evidence; and (5) Florida's death penalty scheme is unconstitutional.
We address those issues that are necessary to our resolution of this case. Because our analysis regarding the sufficiency of the evidence to sustain Crain's conviction is dependent upon our determination of whether the felony murder jury instruction constituted fundamental error, we discuss that issue first.

II. FELONY MURDER JURY INSTRUCTION
The indictment on which Crain was tried and convicted charged him in count I with the premeditated murder of Amanda Brown between September 10 and 11, 1998. Count II of the indictment charged Crain with kidnapping Amanda on the same dates "with the intent to commit or facilitate the commission of a felony, to wit, homicide" in violation of section 787.01(1)(a)(2), Florida Statutes (1997). The kidnapping statute found in section 787.01, Florida Statutes (1997), defines the offense in pertinent part as follows:
(1)(a) The term "kidnapping" means forcibly, secretly, or by threat confining, abducting, or imprisoning another person against her or his will and without lawful authority, with intent to:
1. Hold for ransom or reward or as a shield or hostage.
2. Commit or facilitate commission of any felony.
3. Inflict bodily harm upon or to terrorize the victim or another person.

*68 4. Interfere with the performance of any governmental or political function.
The trial court instructed the jury on first-degree felony murder in count I as follows:
Before you can find the defendant guilty of First Degree Felony Murder, the State must prove the following three elements beyond a reasonable doubt:
One, that Amanda Victoria Brown is dead; two, that the death occurred as a consequence of and while Willie Seth Crain was engaged in the commission of Kidnapping; three, that Willie Seth Crain was the person who actually killed Amanda Victoria Brown.
"Kidnapping" is the forcible or secret confinement, abduction or imprisonment of another, against that person's will and without lawful authority.
The Kidnapping must be done with the intent to commit or facilitate the commission of homicide or to inflict bodily harm upon the victim.
(Emphasis added.) On the separate kidnapping charge in count II, the court gave the following instruction:
Before you can find the defendant guilty of Kidnapping, the State must prove the following three elements beyond a reasonable doubt:
One, that Willie Seth Crain forcibly, secretly or by threat confined, abducted or imprisoned Amanda Victoria Brown, a child under the age of 13 years, against her will; two, that Willie Seth Crain had no lawful authority; three, that Willie Seth Crain acted with the intent to commit or facilitate the commission of homicide.

(Emphasis added.) Thus, while the trial court instructed the jury only on the intent to commit or facilitate the commission of homicide under section 787.01(1)(a)(2) as to the kidnapping charge in count II, the trial court instructed the jury that it could find Crain guilty of felony murder based on kidnapping in count I if it found that he abducted Amanda with either the intent to commit or facilitate the commission of homicide or the intent to inflict bodily harm upon her under section 787.01(1)(a)(3).
Crain argues that because kidnapping with intent to commit homicide was the kidnapping specifically charged in count II of the indictment, the trial court erred in instructing the jury on kidnapping with intent to inflict bodily harm as an alternate method of establishing felony murder based on kidnapping. The State asserts that the trial court did not commit reversible error in instructing the jury on the latter element under an indictment charging premeditated murder. On the facts of this case, we agree.
Although Crain asserts on appeal that this instruction was in error, his trial counsel did not object to the instruction when presented with a packet of corrected jury instructions before closing arguments in the guilt phase of the case. With regard to claims of error pertaining to jury instructions, we have held that "[i]ssues pertaining to jury instructions are not preserved for appellate review unless a specific objection has been voiced at trial." Overton v. State, 801 So.2d 877, 901 (Fla.2001); see also Urbin v. State, 714 So.2d 411, 418 n. 8 (Fla.1998). Because this issue was not preserved by an objection, Crain argues that the felony murder instruction constitutes fundamental error. When constitutional rights are implicated, we have considered issues for the first time on appeal as fundamental error where the error "goes to the foundation of the case or the merits of the cause of action and is equivalent to a denial of due process." J.B. v. State, 705 So.2d 1376, 1378 (Fla.1998).
*69 To determine whether the felony murder instruction based on kidnapping with intent to inflict bodily harm constitutes fundamental error, we must consider two lines of precedent. First, due process prohibits a defendant from being convicted of a crime not charged in the information or indictment. See Aaron v. State, 284 So.2d 673, 677 (Fla.1973) ("The right of persons accused of serious offenses to know, before trial, the specific nature and detail of crimes they are charged with committing is a basic right guaranteed by our Federal and State Constitutions."); Long v. State, 92 So.2d 259, 260 (Fla.1957) ("[W]here an offense may be committed in various ways, the evidence must establish it to have been committed in the manner charged in the indictment."); Lewis v. State, 53 So.2d 707, 708 (Fla.1951) ("No principle of criminal law is better settled than that the State must prove the allegations set up in the information or the indictment."). Consistent with this principle, the Third District Court of Appeal has held that a kidnapping conviction cannot be sustained on evidence of an intent element not charged in the indictment. See Mills v. State, 407 So.2d 218 (Fla. 3d DCA 1981).
The significance of the intent element flows from the status of kidnapping as a specific intent crime. See Sochor v. State, 619 So.2d 285, 290 (Fla.1993). Modern, statutory kidnapping as codified in section 787.01, Florida Statutes, differs from its lesser included offense of false imprisonment in its requirement of proof by the State of one of the four intent elements set out in the statute. See Sean v. State, 775 So.2d 343, 344 (Fla. 2d DCA 2000). As stated in Keith v. State, 120 Fla. 847, 163 So. 136 (1935), the "gist of the offense" is the felonious act of a confinement or abduction with a specific intent. Id. at 138-39.
On the other hand, it is well settled that if an indictment charges premeditated murder, the State need not charge felony murder or the particular underlying felony to receive a felony murder instruction. See Woodel v. State, 804 So.2d 316, 322 (Fla.2001); Gudinas v. State, 693 So.2d 953, 964 (Fla.1997); Kearse v. State, 662 So.2d 677, 682 (Fla.1995). We have held that in felony murder situations the notice required by due process of law and supplied by the charging document as to other offenses is provided instead by our State's reciprocal discovery rules and by the enumeration in section 782.04(1)(a)(2), Florida Statutes (2003), of the felonies on which the State may rely to establish first-degree felony murder. See Kearse, 662 So.2d at 682; see also O'Callaghan v. State, 429 So.2d 691, 695 (Fla.1983). As long as the definition of the underlying felony provided to the jury is sufficiently definite to assure the defendant a fair trial, "[i]t is not necessary ... to instruct on the elements of the underlying felony with the same particularity as would be required if the defendant were charged with the underlying felony." Brumbley v. State, 453 So.2d 381, 386 (Fla.1984); see also Gudinas, 693 So.2d at 964 ("We have repeatedly rejected claims that it is error for a trial court to allow the State to pursue a felony murder theory when the indictment gave no notice of the theory.").
In this case, the State relied on kidnapping to support the felony murder theory of first-degree murder and also charged kidnapping in a separate count of the indictment. However, the instruction on the offense of kidnapping relied upon for felony murder and the instruction on the separate count of kidnapping do not correspond. In the absence of an objection to these divergent instructions, the question becomes whether it was fundamental error for the trial court to give an instruction on *70 the kidnapping underlying felony murder in count I different from the instruction given on kidnapping as charged in count II. We resolve this issue by examining the rationale behind case law allowing instruction on felony murder based on an indictment charging premeditated murder, by looking to the instruction given to Crain's jury on the relationship between the two counts, and finally by looking for any indications in the record that Crain was surprised or prejudiced by the divergent instructions.
First, as we have previously explained, the State need not charge felony murder in a first-degree murder indictment. Second, separate treatment of felony murder and the underlying felony comports with the standard jury instructions which were given in this case:
A separate crime is charged in each count of the indictment and while they've been tried together, each crime and the evidence applicable to it, must be considered separately and a separate verdict returned as to each.
A verdict of guilty or not guilty as to one crime, must not affect your verdict as to the other crime charged.
The jury did not request clarification of the felony murder or kidnapping instructions. Accordingly, we assume that the jury understood and properly applied the instructions, and independently assessed Crain's guilt on each count. See Burnette v. State, 157 So.2d 65, 70 (Fla.1963) (stating that an appellate court must assume that a juror, if properly instructed, will comply with the obligations of the oath and render a true verdict according to the law and the evidence); see also Sutton v. State, 718 So.2d 215, 216 & 216 n. 1 (Fla. 1st DCA 1998), and cases cited therein, ("applying the well-established presumption that juries follow trial court instructions").
Third, we note that Crain's argument on appeal that the indictment gave him constitutionally insufficient notice of felony murder resting on kidnapping with intent to inflict bodily harm is not compelling on these facts. The record contains no indication that Crain was surprised or otherwise prejudiced at trial by the felony murder instruction. The proposed jury instructions provided to Crain's attorney included the alternative of intent to inflict bodily harm as an element of felony murder based on kidnapping. Not only did defense counsel fail to object or otherwise claim surprise, but Crain's attorney specifically referred to the wording of the felony murder instruction in his closing argument.[10] Moreover, Crain's defense at trial in this case was that he was in no way responsible for the disappearance and death of Amanda, not that he lacked the requisite intent.
On this record, we cannot conclude that there was any unfair surprise, failure of notice, or denial of due process as to the felony murder instruction on kidnapping. In light of these considerations, we conclude that the trial court did not commit fundamental error in instructing the jury on "intent to inflict bodily harm" as an alternative to "intent to commit homicide" in defining the underlying felony of kidnapping.[11] *71 In light of this conclusion, we next determine whether the evidence is sufficient to sustain Crain's convictions.

III. SUFFICIENCY OF EVIDENCE

A. Applicable Law
In cases in which the evidence of guilt is wholly circumstantial, it is the trial judge's task to review the evidence in the light most favorable to the State to determine the presence of competent evidence from which the jury could infer guilt to the exclusion of all other inferences. See State v. Law, 559 So.2d 187, 189 (Fla.1989). A reviewing court must assess the record evidence for its sufficiency only, not its weight. We explained in Tibbs v. State, 397 So.2d 1120 (Fla.1981), aff'd, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982):
The weight and the sufficiency of evidence are, in theory, two distinct concepts most often relevant at the trial court level. Sufficiency is a test of adequacy. Sufficient evidence is "such evidence, in character, weight, or amount, as will legally justify the judicial or official action demanded." In criminal law, a finding that the evidence is legally insufficient means that the prosecution has failed to prove the defendant's guilt beyond a reasonable doubt. Weight, at least in theory, is a somewhat more subjective concept. The "weight of the evidence" is the "balance or preponderance of evidence." It is a determination of the trier of fact that a greater amount of credible evidence supports one side of an issue or cause than the other.
As a general proposition, an appellate court should not retry a case or reweigh conflicting evidence submitted to a jury or other trier of fact. Rather, the concern on appeal must be whether, after all conflicts in the evidence and all reasonable inferences therefrom have been resolved in favor of the verdict on appeal, there is substantial, competent evidence to support the verdict and judgment. Legal sufficiency alone, as opposed to evidentiary weight, is the appropriate concern of an appellate tribunal.
Id. at 1123 (citations and footnotes omitted) (quoting Black's Law Dictionary 1285, 1429 (5th ed.1979)).
Although the jury is the trier of fact, a conviction of guilt must be reversed on appeal if it is not supported by competent, substantial evidence. See Long v. State, 689 So.2d 1055, 1058 (Fla.1997). In this regard, we have explained:
A judgment of conviction comes to this Court with a presumption of correctness and a defendant's claim of insufficiency of the evidence cannot prevail where there is substantial competent evidence to support the verdict and judgment. The fact that the evidence is contradictory does not warrant a judgment of acquittal since the weight of the evidence and the witnesses' credibility are questions solely for the jury. It is not this Court's function to retry a case or reweigh conflicting evidence submitted to the trier of fact.
Donaldson v. State, 722 So.2d 177, 182 (Fla.1998) (quotation marks and citations omitted).
The State acknowledges that the evidence of intent in this case is entirely circumstantial. In Law, this Court reiterated the standard of review in circumstantial evidence cases: "Where the only proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt, a conviction cannot be sustained unless the *72 evidence is inconsistent with any reasonable hypothesis of innocence." 559 So.2d at 188 (citing McArthur v. State, 351 So.2d 972 (Fla.1977), and Mayo v. State, 71 So.2d 899 (Fla.1954)).

B. Corpus Delicti
Crain assumes for the purposes of argument that there is sufficient evidence to support the jury conclusion that Amanda is dead and that he killed her.[12] However, in capital cases, this Court independently assesses the sufficiency of the evidence to determine if it is legally sufficient. See Mansfield v. State, 758 So.2d 636, 649 (Fla.2000). Thus, we must determine whether there was sufficient evidence to establish that the alleged victim is dead and that the defendant killed her.
Despite the inability of authorities to find the victim's body, there is competent, substantial evidence, inconsistent with any reasonable hypothesis of innocence, to establish that Amanda is dead and that Crain killed her, establishing two of the three essential elements of first-degree murder. See Fla. Std. Jury Instr. (Crim.) 7.2. These elements subsume the corpus delicti for murder, which consists of the victim's death via the criminal agency of another. See Meyers v. State, 704 So.2d 1368, 1369 (Fla.1997). The corpus delicti of murder can be proven circumstantially, even without any evidence of the discovery of the victim's body. See id.; see also Bassett v. State, 449 So.2d 803, 807 (Fla.1984). In this case, the extraordinary unlikelihood that a seven-year-old child would voluntarily disappear from her sleeping mother's side in the middle of the night and remain alive but never be seen or heard from again is strong circumstantial evidence of her death. See Epperly v. Commonwealth, 224 Va. 214, 294 S.E.2d 882 (1982) (establishing corpus delicti based on evidence of eighteen-year-old victim's character, traits, habits, and relationships, which negated theories of suicide, natural death, accidental death, justifiable, or excusable homicide, or continuing life in absentia).
In addition to the abrupt and permanent disappearance of a young child supporting the inference that Amanda is dead, there is also evidence that Amanda was last seen alive in the presence of Crain, that Amanda's blood was found on Crain's boxer shorts, and that scratch marks consistent with a young girl's fingernails were found on Crain's body. Finally, although not independently determinative, we note that Crain's oddly targeted bleaching of his bathroom in the middle of the night along with his unusual behavior the next morning support a conclusion that Crain's actions with Amanda the previous evening were unlawful and resulted in her death. Thus, we conclude that the totality of these circumstances constitutes substantial, competent evidence from which the jury could reasonably have excluded all inferences other than that Amanda is dead and that Crain killed her. Cf. Meyers, 704 So.2d at 1370 (concluding that the State presented sufficient circumstantial evidence of corpus delicti in case involving disappearance of fourteen-year-old victim, and evidence of injuries to defendant including fingernail scratches).[13]

*73 C. First-Degree Murder
The jury found Crain guilty of first-degree murder on a general verdict form that did not specify whether the verdict was based on premeditated or felony murder. A general guilty verdict rendered by a jury instructed on both first-degree murder alternatives may be upheld on appeal where the evidence is sufficient to establish either felony murder or premeditation. See Jones v. State, 748 So.2d 1012, 1024 (Fla.1999); Mungin v. State, 689 So.2d 1026, 1029-30 (Fla.1995). We conclude that the evidence is sufficient to establish first-degree felony murder based on kidnapping with the intent to inflict bodily harm.
Crain, a fifty-two-year-old man who met Amanda at her mother's house on the day before she disappeared, showed an immediate interest in the child. Crain played games with Amanda and gave her money for her homework, drew with her, and told her about his collection of movies. This initial, apparently benign conduct led to several instances of closer contact, including Crain and Amanda disappearing into his bedroom to watch "Titanic," Hartman subsequently discovering Amanda sitting between Crain's legs, and Crain insisting on blow-drying Amanda's hair. Perhaps most significantly, the last time Hartman saw Amanda, she was sleeping next to Crain in Hartman's bed. Although Hartman did not prevent any of these close contacts, it is reasonable for the jury to have inferred from the evidence of Crain's conduct that Crain had taken steps to ingratiate himself to Amanda.
In addition, the evidence showed that on the night of Amanda's disappearance, a witness living near Amanda's trailer saw a vehicle that matched the description of Crain's truck with its lights on and engine running for approximately five minutes before she heard the truck being driven away. From the evidence of Crain's interest in Amanda, the fact that he was present when Amanda was last seen asleep in her mother's bed, Hartman's testimony that she slept through the night, and the neighbor's observations of Crain's truck, the jury could reasonably have inferred to the exclusion of all other hypotheses that Crain took Amanda from the trailer without the consent of her mother. This conduct establishes an unlawful confinement under the kidnapping statute. See § 787.01(1)(b) ("Confinement of a child under the age of 13 is against her or his will within the meaning of [kidnapping] if such confinement is without the consent of her or his parent or legal guardian.").
However, as noted above, in order to establish a kidnapping the State must also prove that the unlawful confinement occurred with a specific intent. In this regard we note that the Second District Court of Appeal has affirmed a conviction of attempted kidnapping with intent to inflict bodily harm or terrorize the victim in reliance on evidence similar to that in this case, specifically that the defendant took a young, sleeping child from his bed in the middle of the night. See Sean, 775 So.2d at 344. Here, in addition to circumstances similar to Sean, the State also presented evidence that blood consistent with Amanda's DNA was found on Crain's boxer shorts and taken from the toilet tissue found in Crain's toilet bowl. Further, multiple scratches and one cluster of gouges were observed and photographed on Crain's arms. All but two of the scratches were more likely to have been caused by the fingernails of a seven-year-old child than by any other cause. The *74 cluster of small gouges was more likely to have been caused by a small grasping hand consistent with that of a seven-year-old child than by another cause.
Based on this evidence, we conclude that the State presented legally sufficient evidence of a kidnapping with the intent to inflict bodily harm. The DNA blood evidence linked to Amanda that was found on Crain's boxer shorts tends to establish that Amanda bled while Crain was wearing his boxer shorts. Moreover, the DNA evidence indicating a mixture of blood from Crain and Amanda found on the toilet seat and tissue in Crain's bathroom establishes that Amanda and Crain both bled at some point during the kidnapping. When considered in light of the DNA evidence, the scratch and gouge marks on Crain's arms are indicative of a struggle between Crain and Amanda.[14] We note that at the time of her death Amanda was three feet ten inches tall and weighed approximately forty-five pounds. Crain was a fifty-two-year-old man of normal height and weight,[15] engaged in a physically demanding profession. Combined with the disparate height and weight, we conclude that the evidence that a struggle occurred between Amanda and Crain which resulted in both parties' blood loss and numerous scratches and gouges to Crain's arms is a compelling indication of Crain's intent to inflict bodily harm on Amanda.
Our conclusion in this case is consistent with a Virginia Supreme Court decision on analogous facts. In Epperly, the Supreme Court of Virginia considered whether, in the absence of a body and a confession, the evidence was sufficient to support a jury verdict of first-degree premeditated murder. In that case, the defendant and the victim met at a bar and went to a lake house that belonged to a friend of the defendant. The victim's sister reported her missing the next evening. The police ultimately arrested the defendant for her murder despite the fact that the victim's body was never found. In affirming the defendant's conviction for first-degree murder the Virginia Supreme Court noted that a "spattering of tiny droplets of blood through two rooms, the bloodstained clothing, the broken ankle bracelet, the large bloodstain on the carpet, and the disparity of size and strength between [the victim] and the defendant are all circumstances from which the jury could properly infer that she was subjected to a savage beating, resulting in her death." Epperly, 294 S.E.2d at 892.
In this case, we determine that the circumstantial evidence supports a verdict of first-degree murder based on felony murder with the underlying felony being kidnapping with intent to inflict bodily harm. The evidence of an abduction, the drops of *75 blood, the DNA evidence, the disparity of size and strength, and the evidence of a struggle between Amanda and Crain are all circumstances from which a jury could properly infer, to the exclusion of any reasonable hypothesis of innocence, that Crain abducted and intentionally harmed Amanda before her death. The fact that we cannot pinpoint when the actual bodily harm and subsequent killing occurred in relation to the time Crain first kidnapped Amanda does not undermine this conclusion. See Van Gotum v. State, 569 So.2d 773, 776 (Fla. 2d DCA 1990) (holding that the continuing unlawful confinement and the intent to commit grand theft existed simultaneously and involved the same victim and established a confinement with the intent to commit theft). It is sufficient if the State establishes that the unlawful confinement and the specific intent at some point existed simultaneously and involved the same victim. See id.
Accordingly, we find sufficient evidence of a killing in the course of a kidnapping with the intent to inflict bodily harm.[16] On this basis, we affirm the first-degree murder conviction.

D. Kidnapping
We next address whether the evidence is legally sufficient to support the conviction of kidnapping with the intent to commit a homicide as charged in count II of the indictment. Unlike the murder charge, which subsumes all valid felony murder theories, the State cannot rely on the unpled alternative of intent to inflict bodily harm as to this count.
The State argues that the luminol evidence demonstrates that a large amount of blood was spilled in the bathroom and therefore establishes that the kidnapping was committed with an intent to kill. The State's argument on this point invites this Court to stack inferences, which we decline to do. As we stated in Miller v. State, 770 So.2d 1144, 1149 (Fla.2000), "the circumstantial evidence test guards against basing a conviction on impermissibly stacked inferences."
The reaction to luminol in Crain's bathroom may support an inference that Crain was attempting to cover something up rather than cleaning his bathroom in the middle of the night. However, there is no evidence from which the jury could have inferred that there was ever a substantial quantity of blood indicative of a prolonged attack and, therefore, a killing with premeditated intent. Although the DNA blood evidence found on the tissue and the toilet seat in Crain's bathroom independently establishes that Amanda's blood was deposited in Crain's bathroom, it does not establish how much she bled, what caused her to bleed, or where she was killed. Because of the presence of bleach, it is impossible to tell how much of the luminol "glow"  if any  was attributable to blood and how much was attributable to bleach.
To support its theory that the murder was committed with premeditation, the *76 State also relies on evidence that Crain left his truck running outside Hartman's trailer on the night of Amanda's disappearance, exhibited unusual behavior the next morning, and attempted to conceal his crime. These facts evince a plan to remove Amanda from her mother's residence and to eliminate all evidence of her presence at his residence, but do not support an inference that Crain's intent at any specific point in time was to kill her. See generally Norton v. State, 709 So.2d 87, 93 (Fla.1997) ("Efforts to conceal evidence of premeditated murder are as likely to be as consistent with efforts to avoid prosecution for any unlawful killing."); Hoefert v. State, 617 So.2d 1046, 1049 (Fla.1993); see also Smith v. State, 568 So.2d 965, 968 (Fla. 1st DCA 1990).
The impossibility of better reconstructing the circumstances of Amanda's death leaves us unable to conclude that the State presented legally sufficient evidence of a specific intent to kill. Therefore, we conclude that competent, substantial evidence does not exist to support the jury verdict of kidnapping with intent to commit homicide. Accordingly, pursuant to section 924.34, Florida Statutes (1997),[17] we reverse the judgment of guilt of kidnapping and direct the trial court on remand to enter judgment for false imprisonment, and to resentence Crain accordingly.[18]

IV. PROPORTIONALITY OF DEATH SENTENCE
Although Crain does not raise the proportionality of his death sentence as a separate issue on appeal, this Court has an independent duty to perform a proportionality review of all death sentences. See Rimmer v. State, 825 So.2d 304, 331 (Fla.2002). Proportionality review "is not a comparison between the number of aggravating and mitigating circumstances." Terry v. State, 668 So.2d 954, 965 (Fla.1996) (quoting Porter v. State, 564 So.2d 1060, 1064 (Fla.1990)). Rather, our proportionality review requires us to consider the totality of the circumstances in each case, and to compare these circumstances with other capital cases to determine whether death is warranted. See Rimmer, 825 So.2d at 331; Porter, 564 So.2d at 1064.
In this case, Crain's death sentence was supported by three aggravating factors found by the trial court: the murder was committed during the commission of a felony (kidnapping), the defendant was convicted of prior violent felonies (sexual battery and aggravated child abuse), and the victim was under the age of twelve. The trial court rejected statutory mitigating *77 factors, and the nonstatutory mitigation is far from compelling. First, the trial court's finding of nonstatutory mental health impairment was based on the fact that Crain was a pedophile and substance abuser. Second, as noted by the State, the trial court's finding that Crain had the capacity to form loving relationships with his children was a "charitable" finding as none of Crain's children testified during the penalty phase and the defense filed a motion in limine prior to trial to prohibit the State from eliciting testimony concerning Crain's sexual abuse of his own children. The trial court also found that Crain had an abusive childhood, was deprived of educational benefits, and had a good prison record.
In his fourth issue, Crain asserts that the trial court erred in relying on the aggravator of murder in the course of a felony under section 921.141(5)(d), Florida Statutes (1997), because the evidence of the crime of kidnapping is legally insufficient. Assuming without deciding that Crain is correct in light of this Court's reduction of the separate kidnapping conviction to false imprisonment, we conclude that any error in finding the "murder in the course of a felony" aggravator is harmless beyond a reasonable doubt. This case is analogous to Geralds v. State, 674 So.2d 96, 104 (Fla.1996), in which this Court concluded that the erroneous finding of the "cold, calculated, or premeditated" aggravator was harmless based on two valid aggravators  that the murder was heinous, atrocious, or cruel, and that the murder was committed during a robbery/burglary  three mitigators that the trial court gave little weight, and a unanimous death recommendation.
Moreover, we conclude that any error in finding the aggravator of murder in the course of a felony does not affect our proportionality review based on the weight of the two remaining valid aggravators under the circumstances of this case. In making this determination, we remain mindful that proportionality review is not a simple comparison of aggravators and mitigators, and we look to other capital cases involving child victims under twelve in which we have found death sentences proportional. In Lukehart v. State, 776 So.2d 906 (Fla.2000), this Court affirmed a death sentence for the murder of a five-month-old child. We determined that the murder was "significantly aggravated by the existence of the prior conviction for felony child abuse," in which Lukehart caused a closed-head injury to his girlfriend's eight-month-old daughter by shaking her, and concluded that the "prior felony aggravator is an exceptionally weighty aggravating factor under the circumstances of the present case." Id. at 926. In Stephens v. State, 787 So.2d 747 (Fla.2001), we found a death sentence proportional for the murder of a child aged three years, four months. We concluded that "like Lukehart, Stephens' prior violent felony was given great weight and is similar to the events which led to the present murder." Id. at 760. This Court further observed that the record demonstrated that the defendant "was indifferent to the fate of [the] helpless child" and, therefore, concluded that the death penalty was proportional under the circumstances. Id. at 760.
During the penalty phase in this case, the State submitted copies of judgments and sentences for five counts of sexual battery and one count of aggravated child abuse. The State also offered the testimony of three child victims of Crain's previous sexual assaults. The three female victims all testified that Crain began abusing them when they were between the ages of seven and nine years of age. One of the victims endured Crain's repetitive abuse on a monthly basis for five years. The *78 victims also testified that Crain threatened them with extensive bodily harm or death should they reveal his abuse to anyone. Thus, as we found in Lukehart, the prior felony aggravator is an exceptionally weighty aggravating factor under the circumstances of the present case, and as we concluded in Stephens, Crain's history of victimization of children similar in age to the victim in this case increases the magnitude of the prior violent felony aggravator.
In light of the strength of the aggravating factors, the relatively weak mitigation, and our affirmance of death sentences in comparable cases, we conclude that the death penalty is a proportional punishment.

V. CONSTITUTIONALITY OF DEATH PENALTY
In a supplemental brief, Crain raises the issue of the constitutionality of Florida's death penalty scheme in the wake of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). This Court addressed the contention that Florida's capital sentencing scheme violates the United States Constitution under Apprendi and Ring in postconviction appeals in Bottoson v. Moore, 833 So.2d 693 (Fla.2002), and King v. Moore, 831 So.2d 143 (Fla.2002), and denied relief. We have also denied relief in direct appeals where, as in this case, the trial judge has found the aggravating factor of previous conviction of a violent felony. See Duest v. State, 855 So.2d 33, 49 (Fla.2003), cert denied, 541 U.S. 993, 124 S.Ct. 2023, 158 L.Ed.2d 500 (2004); see also Doorbal v. State, 837 So.2d 940, 963 (Fla.) (stating that prior violent felony aggravator based on contemporaneous crimes charged by indictment and on which defendant was found guilty by unanimous jury "clearly satisfies the mandates of the United States and Florida Constitutions"), cert. denied, 539 U.S. 962, 123 S.Ct. 2647, 156 L.Ed.2d 663 (2003). Additionally, the advisory sentence of death in this case was by a unanimous vote. In Anderson v. State, 863 So.2d 169, 189 (Fla.2003), cert. denied, 541 U.S. 940, 124 S.Ct. 1662, 158 L.Ed.2d 363 (2004), we pointed to the unanimous death recommendation as well as a prior violent felony aggravator in rejecting an Apprendi/Ring claim in direct death appeal. We have also rejected Apprendi/Ring claims in other direct death appeals involving unanimous death recommendations. See Conahan v. State, 844 So.2d 629, 642 n. 9 (Fla.), cert. denied, 540 U.S. 895, 124 S.Ct. 240, 157 L.Ed.2d 172 (2003); Chavez v. State, 832 So.2d 730, 767 (Fla.2002), cert. denied, 539 U.S. 947, 123 S.Ct. 2617, 156 L.Ed.2d 637 (2003). Accordingly, we conclude that Crain is also not entitled to relief.

VI. CONCLUSION
For the foregoing reasons, we affirm the conviction of first-degree murder and sentence of death in this case, and reduce the conviction of kidnapping to false imprisonment.
It is so ordered.
PARIENTE, C.J., and ANSTEAD, QUINCE, and CANTERO, JJ., concur.
QUINCE, J., specially concurs with an opinion, in which PARIENTE, C.J., and CANTERO, J., concur.
LEWIS, J., concurs in result only with an opinion.
WELLS, J., concurs in part and dissents in part with an opinion.
QUINCE, specially concurring.
I concur in the majority's decision to affirm the jury's verdict for first-degree *79 murder because the evidence demonstrates beyond a reasonable doubt that Amanda Brown is dead and that her death occurred during criminal activity, a kidnapping, perpetrated by Willie Seth Crain. My agreement with the majority is based on both the absence of evidence which would suggest some other person is responsible for the disappearance and death of Amanda and the circumstances surrounding Crain's interaction with this seven-year-old victim. Thus, the circumstantial evidence in this case leads to the inescapable conclusion that Crain and no one else abducted and murdered Amanda Brown. See Cox v. State, 555 So.2d 352, 353 (Fla.1989) (holding that the circumstantial evidence must lead "to a reasonable and moral certainty that the accused and no one else committed the offense charged").
The time frames involved in this murder indicate there was only a short period of time (at most four hours) between the time that the mother went to sleep and when Crain left her residence, and the discovery that Amanda was not at home. From the testimony of Crain, Kathryn Hartman (Amanda's mother), Penny Probst, a neighbor, and Michelle Rogers, another neighbor, the earliest Crain could have left Hartman's trailer is 2:30 a.m. The neighbors indicated they observed Crain's vehicle on the side of the trailer with the lights on and the engine running at 2:30 a.m. When Hartman awoke at 6:12 a.m., Amanda was not in the bed or in the house. Both Hartman and Roy Brown, Amanda's father, testified that Amanda was afraid of the dark and never wandered outside alone at night. Moreover, there was no indication that there was any type of forced entry into the trailer. The back door to the trailer was kept locked and was locked on September 9, 10 and 11. There was also no evidence that any of Amanda's clothes or toys were missing. Hartman testified that nothing of value was missing from the trailer.
In addition, the circumstances of this case weave a pattern that leads to the inescapable conclusion that Amanda Brown is dead and that Willie Seth Crain caused that death. After meeting Amanda for the first time on the afternoon of September 10, Crain showed a pointed interest in this seven-year-old child. He talked to her about her homework and offered her money if she got the homework correct.[19] He also sat at the kitchen table and played games with her. At some point in the afternoon Crain noticed that Amanda had a loose tooth, and he offered her money if she would let him pull it.[20]
On the evening of September 10, Crain returned to the Hartman residence and again played games with Amanda. At some point in the evening he told them he had a large video collection and invited them to his trailer. Once at Crain's trailer, they began watching a movie in the living room. However, while the mother was on the telephone talking to Crain's sister, Crain took the child into his bedroom to watch the movie. When the mother came in, Amanda was sitting between his legs with his arms around her. Even after Amanda and her mother returned home, Crain continued to show a marked interest in the child when he offered to and did blow dry her hair after she took a shower.[21]
After Amanda and her mother were in bed, Crain laid down in his clothing on the *80 same bed occupied by the females. Less than four hours later, when Hartman got up, both Amanda and Crain were no longer in the residence. When Crain was called by Hartman to see if Amanda was with him, he simply said she was not with him, and he continued to take his boat out. There was no offer of assistance.
The circumstantial evidence produced by the State indicates that after removing Amanda from her home, Crain took her to his trailer and committed acts of violence against her. Blood consistent with Amanda Brown's DNA was found on the toilet seat, on a piece of toilet tissue[22] from Crain's bathroom, and on Crain's boxer shorts. Hartman indicated that she and Amanda used Crain's bathroom when they were there on the evening of the 10th; however, the child was not bleeding during that time. Even more telling is the fact that, after coming home after 2:30 a.m., Crain spent the rest of the early morning hours scrubbing down his bathroom with bleach. He then went out to the Courtney Campbell Causeway and took out his boat.
Amanda's death occurred only one day after Crain was introduced into her life. Hartman met Crain on the night of September 9, 1998. Amanda was not at home when Crain came to the trailer that night or early morning of the 10th. However, he met Amanda on the afternoon of September 10, and she was killed on September 11. Both the jury and this Court would have to engage in sheer speculation to conclude that some other person entered the Hartman dwelling and abducted Amanda during this four-hour window of opportunity.
I believe these facts and circumstances lead to the inescapable conclusion that Amanda Brown is dead and Crain murdered her. Therefore, I concur in the majority's decision affirming Crain's conviction for first-degree murder. See, e.g., Johnston v. State, 863 So.2d 271 (Fla.2003).[23]
PARIENTE, C.J., and CANTERO, J., concur.
LEWIS, J., concurring in result only.
Although I concur in result, it is not without considerable concern and reservations. I have concerns with not only the legal theories and applications, but also with overstatements of facts. We review very tragic circumstances here involving a child, but I cannot agree with characterizations of much of the evidence and inferences upon which others rely for legally sufficient evidence. In my view, the majority and others rely upon strained and improper expanded inferences drawn from the actual evidence presented, which ultimately determine that Crain's intent can be ascertained from far less actual evidence. In my view, it is the actual physical evidence (blood and scratches) along with the actual physical location of such evidence (boxer shorts and arms) that tips the evidentiary balance to support a finding of felony murder based upon kidnapping with the intent to commit bodily harm. Therefore, I cannot fully agree with the majority's decision and discussion of the evidence.
Prior to addressing the ultimate issue in this case, however, I must also initially voice my concern regarding our determination *81 that Crain's death sentence may rest upon a conviction of felony murder, where the underlying felony is kidnapping with intent to commit bodily harm. Crain was indicted on two counts  premeditated murder and kidnapping with intent to commit a homicide. Pursuant to the majority's holding, however, Crain's conviction and sentences are being affirmed based only upon convictions for felony murder and false imprisonment. In my view, this result presents serious due process concerns that cannot be lightly disregarded. While I recognize this Court's repeated adherence to the rule that the state may pursue a theory of felony murder even when the defendant has only been indicted for premeditated murder, I am concerned with our application of the rule here, as I believe this case presents a very unique scenario, and may be clearly distinguishable from those decisions which have relied upon and discussed this rule.[24]
Our rules do not require that the state charge a defendant with felony murder, or even inform the defendant of the specific crimes upon which the state intends to rely, when the state elects to pursue a theory of felony murder. See Kearse v. State, 662 So.2d 677, 682 (Fla.1995). This rule is based upon the theory that through our reciprocal discovery rules and the felony murder statute, a defendant has notice of the charges, the evidence the state will rely upon, and the possible underlying felonies the state may use to prove felony murder. See id. I am not convinced this rationale is always adequate where the state intends to rely upon kidnapping as the underlying felony for felony murder and a separately charged kidnapping count cannot be sustained by the evidence.
Kidnapping is a specific intent crime. Under Florida law, the state is required to prove one of the four enumerated intentional acts to support kidnapping. See Van Gotum v. State, 569 So.2d 773, 775 (Fla. 2d DCA 1990); Mills v. State, 407 So.2d 218, 221 (Fla. 3d DCA 1981). While a charge of first-degree murder may place a defendant on notice of the possibility that the state intends to pursue a theory of felony murder, and the felony murder statute itself informs the defendant of the possible felonies the state may pursue, these provisions do nothing to notify the defendant of the specific intentional conduct the state will seek to prove to support a finding of kidnapping, which I suggest is foundational in the process of formulating any defensive strategy.
Here, the charge of premeditated murder did not place Crain on notice of the underlying felony upon which the State would ultimately rely to support a conviction for felony murder. Instead, that notice was actually supplied by the additional charge of kidnapping with intent to commit a homicide. Indeed, while the State maintains that Crain was on notice regarding intent to inflict bodily harm, the State conceded that its theory of prosecution throughout trial in this case was that Crain kidnapped the child with the intent to commit homicide. Clearly, this was the alleged conduct Crain was on notice to defend against.
As noted, the State charged Crain with both premeditated murder and kidnapping with intent to commit a homicide, and proceeded *82 throughout the trial on only those two theories. It was not until the end of trial, during closing arguments and jury instructions, that the theory of kidnapping with intent to inflict bodily harm was first raised and then presented to the jury for the first time. Also, as a result of the use of a general jury verdict form, it is impossible to ascertain whether the jury found Crain guilty of premeditated murder or felony murder. Further, as it is impossible to know if Crain was convicted of felony murder, it is not known whether the jury determined that Crain had committed a kidnapping with intent to commit a homicide or intent to inflict bodily harm.[25]
We have concluded that the evidence was insufficient to support a finding of premeditated first-degree murder, yet we uphold the conviction based on felony murder with the underlying felony being kidnapping, but then proceed to reduce a second count of kidnapping with intent to commit a homicide to false imprisonment. A review of the numerous decisions of this Court holding that the state may pursue a theory of felony murder even when the defendant has been charged with only premeditated murder, seems to reveal no decision where this Court has applied this rule in a situation similar to that presented here. In all cases where the rule has been followed, either the finding of premeditation has been upheld or the defendant's separate conviction of an underlying felony that would support felony murder could be upheld. Therefore, in those decisions, the defendant was clearly not harmed by the fact that the state charged only premeditated murder.
Here, the evidence does not support a finding of premeditation and we have also reduced the separate charge of kidnapping to false imprisonment, a crime that does not support felony murder. In reviewing Florida law it appears that never before has this Court determined that when premeditation is not supported by the evidence, and the separately charged felony which provided the defendant with notice as to felony murder is also not supported by the evidence, the felony murder theory may be upheld as a basis for conviction. In my view, although our theories of law appear to permit this result, this presents serious due process concerns.
I would agree that here, had the State proven the intent necessary to support the separate charge of kidnapping with intent to commit a homicide, Crain's first-degree murder conviction should clearly be upheld pursuant to the felony murder doctrine, as Crain unquestionably was on notice of that charge and defended against it. However, because the State elected to charge the separate kidnapping count, but failed to prove that charge by legally sufficient evidence, and because it is very likely that the jury relied upon the underlying kidnapping charge to support the felony murder count, Crain's right to due process is placed in question. While I recognize the principle that an appellate court must assume that jurors follow instructions, here Crain's jury was provided two separate instructions for the same crime. These varying instructions could have easily misled or confused the jury, placing the jury's verdict in question. Notably, the State wrote in its brief to this Court:
Under either of the two intents, the evidence is sufficient to find the appellant guilty of felony murder with kidnapping as the underlying felony. However, *83 should this Court determine it must speculate as to which intent the jury found, the fact the jury returned a verdict of guilty on the kidnapping count indicates the jury necessarily found that the kidnapping was done with the intent to commit or to facilitate the commission of a homicide; the intent charged in the indictment.
Answer Brief of the Appellee at 75.
The State could have very easily avoided the problem in this case by charging Crain with felony murder, thereby placing him on notice by enumerating the exact felony upon which it would be relying, or by using a specific jury verdict form. See In re Use By Trial Courts of Standard Jury Instructions in Criminal Cases, 431 So.2d 594, 597 (Fla.1981) (recognizing there could be improvement in the manner in which a case is presented to the jury on alternate theories of felony murder and premeditated murder and suggesting use of special verdict forms as a solution). The State, for unknown reasons, opted not to indict Crain for felony murder, choosing instead to charge him with only first-degree premeditated murder. Further, although not required by law to do so, the State elected to charge Crain with a separate felony, namely kidnapping with intent to commit a homicide, which, if proven, certainly could have been used to support felony murder. Again, the State was free to charge Crain with kidnapping with intent to commit bodily harm, but did not choose to do so. I suggest that when the state elects to charge only premeditated murder, and further elects to charge a felony which, if proven, would support felony murder, it is that felony or a lesser included felony that provides the defendant with notice of the felony the state intends to rely upon should it pursue a theory of felony murder. It is that felony the defendant prepares to defend against, and therefore if the underlying felony cannot be proven, felony murder cannot be found. In cases involving the ultimate punishment of death, a defendant is entitled to the ultimate level of due process. The result attained here without the aid of complete argument from either party generates concerns as to whether Crain received the due process rights to which he is entitled under these specific facts.
Turning to the next issue, the ultimate conclusion affirming Crain's conviction and sentence, with regard to whether the evidence is legally sufficient to support a finding of kidnapping with intent to inflict bodily harm, in my view, the majority's rendition of the facts skews the evidence presented and draws improper and expanded inferences. From the majority's presentation, it is suggested that Crain was a predator, who ingratiated himself into the victim's life through her mother, only to wait for the perfect opportunity to kidnap and murder the child. The majority highlights that Crain visited Hartman's trailer three times in two days, and suggests, in speculation at best, that after the first visit Crain must have known Hartman had a daughter because "two photographs of Amanda and some of her toys were visible in the trailer." Majority op. at 63. Additionally, by noting that Crain assisted Amanda with her homework, gave her money for correct answers, played games with her, and offered to pull a loose tooth, see id. at 63, the majority suggests that Crain took an untoward interest in Amanda during his visits to her mother's trailer. This inference is further developed when the majority notes that Hartman, who had been on the telephone, found Amanda sitting on Crain's bed, between Crain's legs facing the television, with Crain apparently demonstrating to Amanda how to work the remote control, see id. at 63-64, and that *84 later in the night Crain dried Amanda's hair after she had showered. See id. at 64.
Even recognizing that in consideration of a motion for a judgment of acquittal, the court must examine all the facts and inferences in a light most favorable to the state, see McCoy v. State, 853 So.2d 396, 408 (Fla.2003), it is my view that here, the majority opinion has drawn and relied upon expanded inferences contrary to law. The evidence presented demonstrates that Crain never attempted to separate Amanda from her mother, and in fact it was Amanda's mother who voluntarily and intentionally introduced Crain into these circumstances. It was Hartman who solicited Crain into her home. Further, Amanda's mother neither voiced an objection nor asked Crain to leave when Crain laid down on the bed with Hartman and her daughter.
The majority's characterization of Hartman's testimony is in my view also misleading in its suggestiveness. While it may be true that Crain demonstrated an interest in the child by helping her with her homework and rewarding her for correct answers, such is not uncommon or abnormal behavior for an adult in the normal course of human interaction. Further, the evidence shows that the bedroom in which Amanda and Crain were located while Crain assisted Amanda with the operation of the television electronic equipment, was the only room in the trailer with air conditioning and a television. Therefore, it was logical for Crain and Amanda to be in that room while Hartman was on the telephone. When Hartman entered the room, apparently nothing had occurred or was occurring to cause the mother any particular concern for the child's safety. Hartman knew the two were together and apparently had no reason for fear or concern. Hartman, the mother on the scene, apparently observed no improper or illicit conduct or behavior as she freely participated in the various activities from which the majority now attempts to infer a predatory stalking of the child by Crain. The majority seeks to infer something that the mother, who was physically present with her child, apparently did not observe as being the sinister conduct the majority infers. Hartman solicited Crain's presence within her family circle and apparently she never had a reason to ask that he leave or alter his behavior.
Additionally, it is not uncommon that an adult would be positioned behind a child while demonstrating how to work an electronic device, such as a remote control. Crain's interactions with the child were not unlike interactions that adults have with children every day. Hartman's testimony provides no support for our conclusion that Crain kidnapped Amanda with the intent to cause her bodily harm. It must be remembered that it was Hartman who brought Crain into this context and Hartman was present at all times. While in no way suggesting that Hartman is at fault or blameworthy for the tragic circumstances that occurred, it must be recognized that the majority is drawing inferences that even the mother, who was present at the time, clearly did not make.
During trial, Crain moved for a judgment of acquittal both after the State presented its evidence and after the close of all evidence, arguing the State had not presented sufficient evidence to support either premeditated or felony murder. The trial judge denied Crain's motion. This Court has repeatedly held that where a conviction is based wholly upon circumstantial evidence, a special standard of review applies. See Darling v. State, 808 So.2d 145, 155 (Fla.2002); Jaramillo v. State, 417 So.2d 257 (Fla.1982). As stated in State v. Law, 559 So.2d 187 (Fla.1989):

*85 Where the only proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt, a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence. . . .
. . . .
. . . A motion for judgment of acquittal should be granted in a circumstantial evidence case if the state fails to present evidence from which the jury can exclude every reasonable hypothesis except that of guilt. Consistent with the standard set forth in Lynch [v. State, 293 So.2d 44 (Fla.1974)], if the state does not offer evidence which is inconsistent with the defendant's hypothesis, "the evidence [would be] such that no view which the jury may lawfully take of it favorable to the [state] can be sustained under the law." 293 So.2d at 45. The state's evidence would be as a matter of law "insufficient to warrant a conviction." Fla. R.Crim. P. 3.380.
It is the trial judge's proper task to review the evidence to determine the presence or absence of competent evidence from which the jury could infer guilt to the exclusion of all other inferences. That view of the evidence must be taken in the light most favorable to the state.
Id. at 188-89 (citations and footnote omitted) (emphasis added).
Crain's hypothesis of innocence at trial was simply that he was not guilty  that he did not kidnap and kill Amanda Brown. Therefore, it was the trial court's obligation to determine whether the State presented substantial, competent evidence to refute Crain's theory of innocence. In my view, the State could meet its threshold burden and provide competent evidence from which the jury could infer guilt to the exclusion of all other inferences in this case only from the physical blood and scratch injury evidence. Suspicions alone cannot satisfy this burden and the expansive inferences are not, in my view, competent. The majority properly concludes that the evidence was insufficient to support premeditated murder and felony murder based upon kidnapping with intent to commit a homicide. The majority is correct in concluding that the evidence supports that Crain committed felony murder, where the underlying felony is kidnapping with intent to commit bodily harm, but incorrect in seizing upon expansive improper inferences.
Initially, we should not impute upon Crain an admission that he was in fact involved in the murder of Amanda Brown. In his brief to this Court, Crain does assume only for purposes of argument that Amanda is dead and that he killed her, but this does not equate to an admission of guilt that should be used against him as established fact. Crain's primary argument to this Court is that the State did not prove the required intent necessary to support either premeditated or felony murder based on kidnapping with intent to commit homicide.[26] The majority improperly infers that because Crain does not assert on appeal that the evidence was insufficient to prove the fact that Amanda is dead and that he killed her, he has thereby conceded that the child died at his hands. See Majority op. at 72 n. 12. Such a conclusion would necessarily require that this Court infer guilt in every case in which an appellant-defendant does not challenge the sufficiency of the evidence necessary to prove that the victim is dead, *86 and that he or she actually killed the victim. To support the ultimate conclusion that Crain had the requisite intent to commit bodily harm, the majority opinion begins with the presumption that Amanda Brown is dead and that Crain killed her.
In support of the determination that the evidence was sufficient to support felony murder based on the felony of kidnapping with the intent to commit bodily harm, the majority posits that: (1) Crain took a young sleeping child from her mother's bed in the middle of the night; (2) the DNA blood evidence linked to Amanda Brown found on Crain's boxer shorts and the luminol evidence in the bathroom both established that Amanda bled while confined; and (3) the scratch and gouge marks on Crain's arms indicate that a struggle occurred between Crain and Amanda. See Majority op. at 64. The support for the majority decision comes from a Second District decision, Sean v. State, 775 So.2d 343 (Fla. 2d DCA 2000).
The conclusion that Crain's act of removing Amanda from her mother's bed in the middle of the night supports an inference of guilt has some limited support in the record. As noted, the majority begins with the presumption that Crain killed Amanda, and it simply expands that presumption by maintaining that Crain must have taken the child from her mother's bed. The State presented absolutely no evidence that demonstrates that Crain took the child from her mother's bed. The presence of a vehicle without more does not justify the inference the majority imposes. The majority's reliance on Sean is also misplaced. In Sean, the Second District merely noted: "[U]nder the facts in this case, we have no problem affirming Sean's [attempted kidnapping] conviction. The evidence that Sean took a young, sleeping child from his own bed in the middle of the night supports the verdict of guilt." Sean, 775 So.2d at 344. The district court did not explain what evidence supported the conclusion that the defendant had taken the child from his own bed. See id. While I agree that when there is evidence that an adult has taken a child from the child's bed in the middle of the night, that fact may create an inference of fact to support a charge of kidnapping with intent to inflict bodily harm. However, in the instant case, there is no direct evidence to support the allegation that Crain removed the child from her mother's bed, a fact that cannot be merely assumed, which is an assumption drawn by the majority.
The majority also directs attention to evidence of scratch marks on Crain's arms to conclude that a struggle occurred between Amanda and Crain. Crain, who earned his living as a crabber, attributed the scratches and gouges to his work with crab traps. The State did not offer definitive evidence that Crain's version of the facts was not true. In fact, the State's own medical examiner testified that he could not determine with certainty whether the scratches were caused by fingernails. The medical examiner did testify that some of the scratches were more likely caused by fingernails, a factual basis from which inferences may be drawn. Although the expert conceded that all of the scratches were consistent with having been caused by crab traps and wire meshing, such does not negate proper inferences.
The majority further concludes that the luminol evidence presented here establishes that Amanda was bleeding while she was confined by Crain. However, Crain testified that he had cleaned his bathroom with bleach, an assertion supported by the State's witness, Detective Bracket, who testified that when he conducted a search of Crain's trailer, he noticed a very strong odor of bleach in Crain's bathroom. As *87 the State's expert witness testified, luminol reacts with the presence of bleach in the same manner in which it reacts when blood is present. The State presented no evidence that Crain had used bleach to clean blood from his bathroom because no such direct evidence existed. Therefore, in my view, there is no competent evidence inconsistent with the defendant's theory of events concerning the luminol evidence.
The final piece of evidence upon which we rely is the blood found on Crain's boxer shorts, which was subsequently linked by DNA to Amanda Brown. While the existence of this blood evidence alone may be enough to support a finding that Crain possessed the intent to commit bodily harm required to affirm the felony murder conviction, this Court has held even when evidence, such as fingerprints, conclusively links a defendant to a crime, the state must still introduce some other evidence to support a conviction. See Long v. State, 689 So.2d 1055, 1058 (Fla.1997). Similarly, even when evidence, such as a single drop of blood, conclusively links a victim to a defendant, the state is required to introduce other evidence to support a first-degree murder conviction and sentence of death.[27]
This Court has held that "[c]ircumstances that create nothing more than a strong suspicion that the defendant committed the crime are not sufficient to support a conviction." Cox v. State, 555 So.2d 352, 353 (Fla.1989). Further, "[c]ircumstantial evidence is not sufficient when it requires such pyramiding of inferences in order to arrive at a conclusion of guilt." Weeks v. State, 492 So.2d 719, 722 (Fla. 1st DCA 1986). The parties do not dispute that the State's case was based entirely upon circumstantial evidence. The State provided no direct evidence of Amanda's death, that her disappearance was the result of a kidnapping, or that Crain was in any way involved in Amanda's disappearance. The blood and scratch evidence is the only substantive material. The majority begins with the presumption that Amanda is dead and that Crain was involved, and then arrives at a conclusion of guilt based upon a pyramiding of inferences. While the evidence may suggest such suspicions, the majority's ultimate conclusion  that the evidence supports a finding of kidnapping with intent to commit bodily harm  is clearly not without problems. Even if the majority is correct, and we assume Amanda Brown is dead and that Crain killed her, the record is completely void of any direct evidence of his intent to cause Amanda Brown bodily harm. The evidence does not demonstrate how she died, and from the limited evidence presented, it is difficult to determine, to any reasonable degree, Crain's mental state that night. Just as the evidence does not support a finding of premeditation or kidnapping with intent to commit a homicide, it is only circumstantial to prove kidnapping with intent to commit bodily harm when the blood and scratch evidence is considered. While the evidence presented may support a non-intent based homicide, it is not without some good arguments that a conviction for first-degree felony murder and a sentence of death does not have sufficient supporting evidence. Therefore, I concur in result only.
WELLS, J., concurring in part and dissenting in part.
*88 I concur that there is insufficient evidence to sustain the kidnapping conviction. I dissent to the affirming of the first-degree murder conviction.
Based upon the record presented in this case, there are simply too many assumptions which have to be made to affirm Crain's conviction for first-degree murder, either premeditated or felony. Since the child's body has not been located, the initial inference which has to be made is that she is dead. From that inference, all others have to be stacked. I have to recognize what the trial judge concluded in her sentencing order: "There is no way to know exactly what happened to Amanda Brown." State v. Crain, No. 98-17084, order at 2 (Fla. 13th Cir. Ct. order filed Nov. 19, 1999). That is the evidence in the record.
It appears to me that this case is similar to the case this Court had before it in Meyers v. State, 704 So.2d 1368 (Fla.1997). However, the clear distinction was that in Meyers, there was a confession to cell mates which overcame the wholly circumstantial evidence of a case in which the child's body was never located.
In Cox v. State, 555 So.2d 352, 353 (Fla.1990), we said:
This Court has long held that
one accused of a crime is presumed innocent until proved guilty beyond and to the exclusion of a reasonable doubt. It is the responsibility of the State to carry this burden. When the State relies upon purely circumstantial evidence to convict an accused, we have always required that such evidence must not only be consistent with the defendant's guilt but it must also be inconsistent with any reasonable hypothesis of innocence.

Davis v. State, 90 So.2d 629, 631 (Fla.1956); McArthur v. State, 351 So.2d 972 (Fla.1977). Circumstantial evidence must lead "to a reasonable and moral certainty that the accused and no one else committed the offense charged." Hall v. State, 107 So. 246, 247 (Fla.1925). Circumstances that create nothing more than a strong suspicion that the defendant committed the crime are not sufficient to support a conviction. Williams v. State, 143 So.2d 484 (Fla.1962); Davis; Mayo v. State, 71 So.2d 899 (Fla.1954).
One of this Court's functions in reviewing capital cases is to see if there is competent substantial evidence to support the verdict. Williams v. State, 437 So.2d 133 (Fla.1983), cert. denied, 466 U.S. 909, 104 S.Ct. 1690, 80 L.Ed.2d 164 (1984). After reviewing this record, we find that the state's evidence is not sufficient to support Cox' conviction.
See also Long v. State, 689 So.2d 1055, 1057-58 (Fla.1997).
NOTES
[1] See art. V, § 3(b)(1), Fla. Const.
[2] At the time she took the Valium, Hartman had a twelve-year addiction to pain pills. Crain testified at trial that he was unaware of the addiction.
[3] Michelle Rogers, another neighbor of Hartman, testified that she saw a light blue truck parked behind Hartman's car at approximately 10:30 p.m. on September 10, 1998. Rogers further testified that she saw a light blue truck positioned beside the residence at 10:45 p.m. on September 10, 1998. Rogers stated that she left her residence around 11 p.m. and when she returned at 2:30 a.m., she observed the truck parked on the side of the residence with the lights on.
[4] It is undisputed that these comments occurred during a discussion between Crain and Darlington regarding Crain's disagreements with other crabbers about Crain's claims that they had stolen from Crain's crab traps.
[5] Crain testified at trial that he left Hartman's residence between 2:30 and 3:30 in the morning.
[6] Crain testified at trial that he cleaned his bathroom with bleach at around 3 a.m. and left to go crabbing between 5 a.m. and 6 a.m.
[7] The blood stains were very small. The blood stain on the tissue was not visible to the human eye. When a North Carolina laboratory performed an independent analysis on the blood evidence, its expert could not find enough DNA on the tissue stain to corroborate the testimony of the FDLE forensic scientist identifying Crain and Amanda as the sources of the tissue stain.
[8] Stem's daughter was married to Crain's son.
[9] The nonstatutory mitigators the trial court found were: (1) nonstatutory mental health impairment (some weight); (2) mental problems exacerbated by the use of alcohol and drugs, both legal and illegal (some weight); (3) Crain was an uncured pedophile (some weight); (4) Crain had a history of abuse and an unstable home life (modest weight); (5) Crain was deprived of the educational benefits and social learning that one would normally obtain from public education (modest weight); (6) Crain had a history of hard, productive work (some weight); (7) Crain had a good prison record (modest weight); and (8) Crain had the capacity to form loving relationships (modest weight).
[10] In discussing the anticipated instruction on felony murder, counsel stated:

They still have to prove under the felony murder theory, they have to prove that Amanda Victoria Brown is dead and that she died  the death occurred as a consequence of and while Willie Seth Crain was engaged in the commission of kidnapping.
....
The instruction further says that the kidnapping must be done with the intent to commit or facilitate the commission of homicide or to inflict bodily harm upon the victim.
[11] We do not address whether the felony murder instruction given in this case would have constituted harmful error had Crain preserved the issue with a proper objection.
[12] Crain has not asserted in his appeal that the evidence was insufficient to prove either that Amanda is dead or that he killed her.
[13] Justice Wells' partially dissenting opinion in this case includes the assertion that this case is distinguishable from Meyers only in the absence of a confession, which Justice Wells deems fatal to Crain's conviction. However, unlike Meyers, in which the defendant's confession was necessary to establish that the victim's death was caused by the defendant's criminal act, see 704 So.2d at 1370, in this case the circumstantial and physical evidence was such that the jury could lawfully have concluded that it was the defendant and no one else who committed the killing.
[14] Crain asserted at trial and on appeal that he obtained the scratch marks while crabbing. Relying on testimony from the medical examiner that he could not determine with any degree of certainty whether the scratches were caused by fingernails or crab traps, Justice Lewis states in his separate opinion that "[t]he State did not offer definitive evidence that Crain's version of the facts was not true" regarding the origin of the scratch marks. See infra at 86. However, we note that the circumstantial evidence standard requires this Court to take every inference in the light most favorable to the State. See Law, 559 So.2d at 189. The State offered evidence that Crain's version of the events was untrue  namely the medical examiner's testimony that the scratches were more likely to have been caused by the fingernails of a seven-year-old girl than by a crab trap. Applying the review standard for circumstantial evidence to this evidence, we conclude that the jury could have properly rejected Crain's version that the scratches came from crabbing.
[15] The October 1, 1998, arrest report reflects that Crain was six feet tall and weighed 150 pounds.
[16] Because we determine that the evidence is sufficient to support a first-degree felony murder conviction, we decline to directly address Crain's argument that the evidence is insufficient to establish first-degree premeditated murder. Any error in instructing the jury on premeditated murder based on insufficient evidence of premeditation is necessarily harmless. See Jones, 748 So.2d at 1024 ("[E]ven if the evidence does not support premeditated murder, any error in charging the jury on that theory is harmless where the evidence supports a conviction for felony murder, which has also been charged."); Mungin, 689 So.2d at 1029-30 (concluding that error in instructing on felony murder was "clearly harmless" where evidence supported conviction for felony murder and the jury properly convicted defendant of first-degree murder on this theory).
[17] Section 924.34 provides:

When the appellate court determines that the evidence does not prove the offense for which the defendant was found guilty but does establish guilt of a lesser statutory degree of the offense or a lesser offense necessarily included in the offense charged, the appellate court shall reverse the judgment and direct the trial court to enter judgment for the lesser degree of the offense or for the lesser included offense.
[18] False imprisonment does not require specific intent. See State v. Sanborn, 533 So.2d 1169, 1170 (Fla.1988) (concluding that the general intent of false imprisonment is included in the specific intent of kidnapping). Section 787.02, Florida Statutes (1997), provides in pertinent part:

(1)(a) The term "false imprisonment" means forcibly, by threat, or secretly confining, abducting, imprisoning, or restraining another person without lawful authority and against her or his will.
(b) Confinement of a child under the age of 13 is against her or his will within the meaning of this section if such confinement is without the consent of her or his parent or legal guardian.
[19] He eventually gave her $2.
[20] This time the offer of money was $5.
[21] Hartman testified there that were no cuts or sores on Amanda's body when she helped Amanda dry off and get ready for bed.
[22] The blood on the tissue was consistent with a mixture of the DNA profiles of Amanda Brown and the defendant.
[23] I also agree with the majority that the jury was properly instructed on felony murder with the underlying felony being kidnapping to facilitate great bodily harm even though the defendant was not charged with this form of kidnapping.
[24] I must note that it is troubling to me that neither the State nor Crain gave more than passing consideration to the theory, namely felony murder based upon kidnapping with intent to inflict bodily harm, upon which the majority is upholding Crain's first-degree murder conviction and sentence of death. While Crain argued that neither premeditation nor kidnapping with intent to commit a homicide was supported by the evidence, he never addressed whether kidnapping with intent to commit bodily harm was proven.
[25] However, as the State noted in its brief, the jury's erroneous determination of guilt as to the charge of kidnapping with intent to commit a homicide strongly suggests that if the jury found Crain was guilty of felony murder, the underlying felony upon which the jury relied was kidnapping with intent to commit a homicide.
[26] Crain also asserted in his brief that the trial court erred in denying his motion for a judgment of acquittal.
[27] This same rationale applies to the small, almost invisible blood stain found on Crain's toilet seat. That blood establishes only that Amanda was present in Crain's bathroom, a bathroom she had used prior to her disappearance, and in no way supports a finding that Crain kidnapped Amanda with the intent to commit bodily harm.