PER CURIAM.
Willie Seth Crain, Jr., a prisoner under sentence of death, appeals the denial of his motion for postconviction relief filed pursuant to Florida Rule of Criminal Procedure 3.851,[1] Through his postconviction motion, Crain challenges his capital murder conviction and sentence of death arising from the September 1998 murder of seven-year-old Amanda Brown. On direct appeal, this Court evaluated the circumstantial evidence of Crain’s guilt and affirmed his first-degree felony murder conviction, concluding that sufficient evidence existed that Crain killed Amanda in the course of a kidnapping with the intent to inflict bodily harm. In the instant post-conviction appeal, Crain primarily criticizes his counsel’s performance at trial for failing to adequately challenge the State’s circumstantial case. Crain argues that counsel rendered ineffective assistance for stipulating to the fact that DNA matching Amanda’s DNA was derived from blood as opposed to some other source. He also contends that counsel were ineffective for failing to retain and call an expert to challenge the State’s scratch-marks expert. Crain additionally challenges counsel’s presentation of mental health mitigation during the penalty phase. After conducting an evidentiary hearing, the postconviction court denied relief on these claims, as well as summarily denying relief on Crain’s challenge to the rules prohibiting juror interviews. We affirm the postcon-viction court’s denial of all claims.
FACTS AND PROCEDURAL HISTORY
Crain, then a fifty-two-year-old fisherman and crabber, was charged with the kidnapping and first-degree murder of Amanda Brown. On direct appeal, this Court detailed the evidence establishing Crain’s involvement with Amanda’s disappearance. Because this postconviction challenge focuses on the circumstantial evidence, we set forth these facts to place Crain’s arguments in the appropriate context:
[0]n September 9, 1998, Crain’s daughter, Cynthia Gay, introduced Crain to Amanda’s mother, Kathryn Hartman, at a bar in Hillsborough County. Crain and Hartman danced and talked for four hours, until 1:30 or 2:00 in the morning, then went to Hartman’s residence, a trailer located in Hillsborough County, where they remained for approximately thirty minutes. Amanda was spending the night with her father and was not present. However, two photographs of Amanda and some of her toys were visible in the trailer. Before Crain left, Hartman made it clear to Crain that she wanted to see him again.
The next afternoon, September 10, 1998, Crain returned to Hartman’s trailer. Hartman testified that Crain smelled of alcohol and carried a cup with a yellow liquid in it. Amanda was present. Crain began talking to Amanda about her homework. He pulled some money out and told Amanda that if she got her homework right, he would give her a dollar. He eventually gave her two dollars. Crain and Amanda sat at the kitchen table playing games and working on her homework. At some point during the afternoon, Crain became aware that Amanda had a loose tooth. After wiggling the tooth, Crain offered Amanda five dollars to let him pull the tooth out, but she refused. Hartman testified that the tooth was not ready to be pulled out. Crain remained at Hartman’s residence for approximately one hour. Before he left early in the *1029 afternoon, Crain accepted Hartman’s invitation to return for dinner that evening.
Crain returned to Hartman’s trailer shortly after 7 p.m. Crain still smelled of alcohol and carried the same or a similar plastic cup with a colored liquid. After dinner, Hartman and Crain played more games with Amanda. At some point, Crain mentioned that he had a large videotape collection and invited Hartman and Amanda to his trailer to watch a movie. Amanda asked if he had “Titanic,” which she stated was her favorite movie. Crain stated that he did have “Titanic” and Amanda pleaded with her mother to allow them to watch the movie. Hartman was initially reluctant because it was a school night, but she finally agreed. Crain drove Hartman and Amanda approximately one mile to his trailer in his white pickup truck.
They began watching the movie in Crain’s living room but were interrupted by a telephone call from Crain’s sister. Crain said he did not get along with his sister and asked Hartman to speak to her. At the conclusion of a twenty- to twenty-five-minute phone conversation with Crain’s sister, Hartman found the living room unoccupied. Hartman opened a closed door at the rear of the trailer without knocking, and found Amanda and Crain sitting on the bed in Crain’s bedroom, watching the movie “Titanic.” Both were dressed and Amanda was sitting between Crain’s sprawled legs with her back to Crain’s front. Crain’s arms were around Amanda and he appeared to Hartman to be showing Amanda how to work the remote control. Hartman testified that although she was not overly concerned about what she observed at that time, she nevertheless picked Amanda up and sat Amanda beside her on the bed. Crain, Hartman, and Amanda then watched the movie together in Crain’s bedroom. Crain testified at trial that they watched the movie in his bedroom because it was the only air-conditioned room in the trailer.
At some point in the evening, Amanda and Hartman used Crain’s bathroom together. While they were in the bathroom, Hartman did not notice Amanda bleeding from any location that Hartman could observe. Hartman did notice a blue cover on the back of the toilet seat. Amanda did not use the bathroom at any other time that evening.
At another point in the evening, Hartman asked Crain if he had any medication for pain. Crain offered her Elavil and Valium. He also offered her some marijuana, which she declined. Crain told Hartman that the Elavil would “really knock the pain out” and would make her sleep for a long time. Hartman elected to take five, five-milligram Valium tablets. Crain took one Valium tablet.
Eventually, Hartman decided that it was time to leave. Crain drove Hartman and Amanda back to their residence and accompanied them inside. Amanda took a shower. While checking on Amanda during the shower and helping her dry off and get ready for bed, Hartman did not notice any sores or cuts on Amanda’s body. According to Hartman, Crain suggested that Amanda should not go to sleep with wet hair, so Crain blow-dried Amanda’s hair in Hartman’s bathroom without Hartman present. According to Hartman, when Amanda went to sleep in Hartman’s bed around 2:15 a.m., the loose tooth was still in place and it was not bleeding.
According to Hartman, she told Crain, who appeared to be intoxicated at that time, that he could lie down to sober up but she was going to bed. The time was *1030 approximately 2:30 a.m. Within five minutes of Hartman going to bed, Crain entered Hartman’s bedroom and lay down on the bed with Hartman and Amanda. Hartman testified that she neither invited Crain to lie in her bed nor asked him to leave. Crain was fully clothed and Amanda was wearing a nightgown. Amanda was lying between Hartman and Crain.
Penny Probst, a neighbor of Hartman, testified that at approximately 12 midnight on September 10-11,1998, she saw a white truck parked immediately behind Hartman’s car in Hartman’s driveway. In the early morning hours of September 11, Probst observed the truck parked at the side of Hartman’s residence with the lights on and the engine running. Probst heard the truck leave after about five minutes.
Hartman slept soundly through the night. When she awoke in her bed alone the next morning, she discovered that Amanda was missing. Hartman testified her alarm clock read 6:12 a.m. when she awoke. Hartman immediately called Crain on his cell phone. At that time, he was at the Courtney Campbell boat ramp in Hillsborough County loading his boat. He told Hartman that he did not know where Amanda was. Hartman then called the police and reported Amanda’s disappearance.
At trial, the State presented the testimony of fisherman Albert Darlington, who witnessed Crain towing his boat into the Courtney Campbell loading area at approximately 6:15 a.m. on September 11, 1998. Darlington testified that Crain pulled up to the boat ramp and backed his boat trailer and truck into the water until the truck’s front tires were halfway submerged. Crain then got out of his truck and boarded his boat wearing what appeared to be a two-tone maroon shirt and dark slacks, and carrying what appeared to be a rolled-up item of clothing. Crain unhooked his boat and launched it in an overall “odd” manner. Darlington further testified that in the eighteen months prior to Amanda’s disappearance, on two occasions Crain told Darlington that Crain had the ability to get rid of a body where no one could find it.
At around 8:30 a.m. on September 11, Detective Mike Hurley located Crain in his boat in Upper Tampa Bay. Crain was dressed in “slickers” (rubber pants fisherman wear over their clothes), a blue t-shirt, and loafers. Crain and Hurley returned to the boat ramp in Crain’s boat. On the ride back, Hurley noticed a small scratch on Crain’s upper arm. At the boat ramp, Crain removed his slickers, revealing jeans with the zipper down. Hurley took Crain to the police station for questioning. Crain was cooperative but denied having anything to do with Amanda’s disappearance.
At the police station, Detective A1 Bracket interviewed Crain. Crain told Bracket that he left Hartman’s house alone at about 1:30 in the morning, went home and accidentally spilled bleach in his own bathroom. Crain claimed that he did not like the smell of bleach, so he spent four hours cleaning his bathroom from about 1:30 to 5:30 in the morning. Later in the same interview, Crain said he cleaned his bathroom with bleach, as was his custom, then cleaned the rest of the house until 5:30 a.m., at which time he left to go crabbing.
Crain v. State, 894 So.2d 59, 63-65 (Fla.2004) (footnotes omitted).
The record reveals that during the questioning, Bracket noticed multiple scratch marks on Crain’s arms. Thereafter, photographs of Crain’s body were taken. A *1031 forensic pathologist, Dr. Russell Vega, testified at trial that in his opinion, all but two of the scratch marks were “consistent with” having been caused by the fingernails of a seven-year-old child and one cluster of three scratch marks was “somewhat more likely” to have been caused by fingernails than those depicted in the other photographs. He further testified that one cluster of small gouges on Crain’s arm was “somewhat suggestive of ... having been caused by a small grasping hand” with spacing consistent with the hands of a seven-year-old child.[2]
On direct appeal, we further explained:
During a search of Crain’s residence, Bracket noticed the strong smell of bleach and recovered an empty bleach bottle. Bracket testified that there were obvious signs of grime and dirt around the edges of the bathroom sink. A blue fitted rug that would go around the base of the toilet was found in Crain’s dryer. Another detective applied Luminol, a chemical that reacts both with blood and with bleach, to Crain’s bathroom. The detective testified that the floor, the bathtub, and the walls “lit up.”
Bracket also recovered two pieces of toilet tissue from the inside rim of Crain’s toilet and observed what appeared to be a small blood stain on the seat of the toilet. The tissue pieces, the toilet seat, and the boxer shorts that Crain was wearing on the morning of September 11, 1998, were collected and analyzed for DNA evidence. A forensic scientist for the Florida Department of Law Enforcement (FDLE) testified at trial that two blood stains were found on the toilet seat, one blood stain was found on one of the pieces of toilet tissue, and one blood stain was found on the boxer shorts. The FDLE forensic scientist testified that the blood stain on the boxer shorts and one of the stains from the toilet seat contained DNA consistent with the DNA extracted from personal items belonging to Amanda Brown. The second stain on the toilet seat and the stain on the tissue contained DNA consistent with a mixture of the DNA profiles of Amanda and Crain. Testimony established that the probability of finding a random match between the DNA profile on the boxer shorts and Amanda’s known DNA profile is approximately 1 in 388 million for the Caucasian population.
Detective Hurley supervised an extensive, two-week search for Amanda in Upper Tampa Bay, the land surrounding Upper Tampa Bay (including the Courtney Campbell Causeway), and the land *1032 area surrounding the Crain and Hartman residences. Amanda’s body was never found. The maroon shirt and dark pants that Darlington saw Crain wearing on the morning of September 11,1998, also were never recovered.
At trial, the State introduced the testimony of Linda Miller, Maryann Lee, and Frank Stem. Miller and Lee, who were neighbors of Crain’s daughter, Gay, testified about a conversation with Crain that occurred at Gay’s home on the first Saturday after Amanda’s disappearance. Miller and Lee both testified that Miller said to Crain, “Don’t worry, you don’t have anything to worry about,” and “Just remember, you didn’t do anything, you didn’t hurt that little girl.” According to the testimony of Miller and Lee, Crain responded, “Yes, I did do it; yes, you’re right, I didn’t hurt her, I didn’t do anything.” Gay testified that Crain said, stuttering, “yes, I did ... did ... didn’t do it; yes, you’re right, I didn’t hurt her.”
Frank Stem, Crain’s friend and in-law, testified that about one month prior to Amanda’s disappearance, Stem helped Crain lay crab traps in a “special” location. At that time, Crain told Stem that other crabbers would steal the crab traps if they knew of the spot. After Amanda disappeared and during a conversation regarding competing crabbers finding his crab traps, Crain told Stem that if Stem revealed the location of the traps “that it could bury him,” meaning Crain, or that Stem had enough “evidence to bury him.”
Crain then testified in his defense and denied that he was involved in Amanda’s death. He stated that he last saw Amanda while she lay sleeping in her mother’s bed in the early morning hours of September 11,1998.
On the first-degree murder charge in count I, the trial court instructed the jury on the dual theories of premeditated murder and felony murder based on kidnapping “with intent to commit or facilitate the commission of homicide or to inflict bodily harm upon the victim.” On the kidnapping charge in count II, the court instructed the jury that the State had to prove that Crain acted “with intent to commit or facilitate the commission of a homicide.” The jury found Crain guilty of first-degree murder on a general verdict form. The jury also found Crain guilty of kidnapping as charged. In the penalty phase, the jury unanimously recommended the death sentence. The trial court found three aggravators: (1) prior violent felonies (great weight), (2) the murder was committed during the course of a kidnapping (great weight), and (3) the victim was under the age of twelve (great weight). The court found no statutory mitigators and [several] nonstatutory mitigators, and imposed the death sentence.
Crain, 894 So.2d at 65-67 (footnotes omitted).
This Court affirmed Crain’s conviction for first-degree felony murder and sentence of death as to count I in the indictment. Id. at 78. With respect to his sentence and conviction for kidnapping with the intent to commit or facilitate commission of a homicide, count II of the indictment, the Court reversed Crain’s conviction because competent, substantial evidence did not exist to support the jury verdict as charged in the indictment. Id. at 76.[3] As a remedy, the Court remanded *1033 to the trial court to enter judgment for false imprisonment and to resentence Crain accordingly. Id.
In September 2006, Crain filed a motion for postconviction relief, raising a total of nine claims.[4] Following a status conference, the postconviction court conducted an evidentiary hearing on Crain’s ineffective assistance of counsel claims. The postconviction court subsequently denied relief on all nine claims.
ANALYSIS
Crain appeals to this Court the denial of his motion for postconviction relief, expressly raising five claims. Crain raises three ineffective assistance of counsel claims, asserting that counsel were ineffective for failing to (1) challenge the State’s circumstantial case as it related to DNA evidence introduced at trial and stipulated to as being derived from blood; (2) call an expert to challenge the State’s expert witness, who testified as to thé origin of scratch marks on Crain’s body; and (3) adequately investigate, prepare, and present available mitigation and provide competent expert psychological evaluation and testimony. In his fourth claim, Crain argues that the rules restricting trial counsel’s ability to interview jurors are unconstitutional. As to his final claim, he asserts that the cumulative effect of the errors and omissions of trial counsel warrants relief. We address each claim in turn, beginning with Crain’s ineffective assistance of counsel claims.[5]

Ineffective Assistance of Counsel Claims

The first three claims raise issues relating to ineffective assistance of counsel. In order to prevail on a claim of ineffective assistance of counsel, a defendant must show both that trial counsel’s performance was deficient and that the deficient performance prejudiced the defendant so as to deprive him of a fair trial. Strickland v. Washington, 466 U.S. 668, *1034 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To establish the deficiency prong under Strickland, the defendant must prove that “counsel made errors so serious that counsel was not functioning as the ‘counsel’ guaranteed the defendant by the Sixth Amendment.” Id. at 687, 104 S.Ct. 2052. The defendant carries the burden to “overcome the presumption that, under the circumstances, the challenged action ‘might be considered sound trial strategy.’ ” Id. at 689, 104 S.Ct. 2052 (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). Under the prejudice prong, “Strickland, places the burden on the defendant, not the State, to show a ‘reasonable probability’ that the result would have been different.” Wong v. Belmontes, — U.S.-, 130 S.Ct. 383, 390-91, 175 L.Ed.2d 328 (2009) (quoting Strickland, 466 U.S. at 694, 104 S.Ct. 2052). “A reasonable probability is a probability sufficient to undermine confidence in the outcome.” Strickland, 466 U.S. at 694, 104 5.Ct. 2052.
Because both prongs of the Strickland test present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the postconviction court’s factual findings that are supported by competent, substantial evidence, but reviewing the postconviction court’s legal conclusions de novo. Sochor v. State, 883 So.2d 766, 771-72 (Fla.2004).
The State’s Circumstantial Case
In his first claim, Crain contends that trial counsel were ineffective for failing to challenge the State’s circumstantial case as it related to several pieces- of DNA evidence introduced at trial. Crain’s contention focuses on the effects of counsel’s stipulation that DNA stains consistent with Amanda’s DNA, which were found on Crain’s boxer shorts and inside Crain’s bathroom following Amanda’s disappearance, came from bloodstains rather than from another source of DNA, such as urine, saliva, or tears. Specifically, Crain argues that no scientific testing conclusively established that the stains collected and tested were blood, yet the stains were repeatedly referred to as bloodstains during trial. Crain further argues that there was no independent DNA testing or expert testimony offered to challenge the DNA evidence presented and that counsel should have retained an expert to test or examine the DNA evidence and educate the jury about the lack of conclusive testing to establish that the evidence was blood, the potential alternative sources of DNA, the possible cross-contamination of evidence collected, and the lack of substrate control testing.[6] After conducting an evidentiary hearing on this claim, the postconviction court denied relief under both prongs of the Strickland, test.
The facts underlying this claim show that at trial, law enforcement officials testified that after Amanda disappeared, they recovered a piece of toilet tissue from the inside rim of Crain’s toilet and observed what appeared to be two small bloodstains on the seat of the toilet. Thereafter, the piece of tissue (State’s Exhibit 18), the toilet seat (State’s Exhibit 17(A)), and the boxer shorts Crain was wearing on the morning of September 11, 1998 (State’s Exhibit 46), were collected and analyzed for DNA evidence. The stains were first tested by the Florida Department of Law *1035 Enforcement (FDLE) and then sent to LabCorp, an independent testing facility in North Carolina. Before the State offered the testimony of Dr. Theodore Yeshion, a forensic scientist for FDLE, to interpret these findings, the trial court read the following stipulation to the jury:
The State of Florida and the defendant, Willie Crain, and his undersigned attorneys, hereby stipulate and agree that the bloodstain found on the toilet seat in Willie Crain’s home, State’s Exhibit 17(A), stain one, has the same DNA profile as the DNA profile found on two items represented as belonging to Amanda Brown....
The State and the defense further stipulate that the bloodstain found on the boxer shorts, State’s Exhibit 46, taken from Willie Crain on September 11, 1998, has the same DNA profile as the DNA profile found on two items represented as belonging to Amanda Brown....
(Emphasis added.) The stipulation was agreed upon prior to trial, during which defense counsel informed the court that they had consulted with a DNA expert, Dr. William Shields, who had reviewed all the documentation and had given counsel advice. The court asked Crain whether he agreed with this stipulation, and Crain acknowledged his agreement with it and that he was not coerced.
Subsequently, Dr. Yeshion testified that he conducted a preliminary visual examination of the toilet seat, State’s Exhibit 17(A). However, to determine whether reddish-brown stains found on that item were in fact blood, he performed a “presumptive blood test,” or “phenolphthalein” test, which is “a chemical presumptive test that simply indicates that blood may be present.” Dr. Yeshion stated that after conducting this test, he was able to find two areas on the toilet seat that contained blood. Dr. Yeshion also tested the boxer shorts recovered from Crain’s person (State’s Exhibit 46) for the presence of blood and noted that he found very a small bloodstain on them. With respect to the toilet tissue recovered, Dr. Yeshion testified that it was very difficult to detect any obvious bloodstains but after examining a smaller, darker area microscopically, he performed the phenolphthalein test on that stain and found a very small amount of blood on the tissue. Dr. Yeshion concluded that the bloodstain on the boxer shorts and one of the stains from the toilet seat contained DNA consistent with the DNA extracted from personal items belonging to Amanda. The second stain on the toilet seat and the stain on the tissue contained DNA consistent with a mixture of the DNA profiles of Amanda and Crain.
When Crain took the stand in his own defense, he appeared to offer an innocent explanation for the presence of blood inside his bathroom. Crain explained that while he was inside Hartman’s trailer on the afternoon of September 10, he observed Amanda wiggling her tooth around because “it was ready to fall out.” He testified that later in the evening, when Hartman and Amanda returned to Crain’s trailer, Amanda was again wiggling her tooth and noted that the tooth was bleeding and getting on her finger, causing Crain to pull off toilet paper to prevent Amanda from getting blood on her hands. According to Crain, Amanda used his bathroom once with her mother and then once by herself for around six to eight minutes. Crain also stated that he kept his underwear on the back of his toilet and put those clothes on before going crabbing in the morning. Crain finally explained that he suffers from hemorrhoids and bleeds almost all the time when he tries to use the bathroom.
*1036 At the evidentiary hearing, Crain’s counsel testified that he considered either challenging the validity of the DNA results or providing a reasonable explanation for the presence of the DNA evidence that would be consistent with pretrial statements Crain made to the media and law enforcement officials. According to trial counsel, Crain had offered a reasonable explanation for the presence of Amanda’s blood inside his residence in pretrial statements to the media (to a local reporter and to producers of a national talk show), and Crain insisted on testifying to the same during trial.[7] Thus, it was counsel’s informed strategy to not contest the DNA results because they “were to some extent locked in by [Crain’s] previous statements,” and counsel did not want to present a position inconsistent to that which Crain had previously stated or would have testified in the future. Counsel further explained that the DNA stipulation was entered into only after consulting with Dr. Shields, the retained confidential DNA expert, and with Crain, who willingly signed the stipulation. In fact, prior to the stipulation, counsel provided Dr. Shields with copies of lab reports, bench notes, and any discovery related to the DNA evidence in an effort to challenge the State’s results. However, Dr. Shields did not provide any information to refute the lab findings, did not find any evidence of contamination during the testing process, did not raise a concern that the failure by either the FDLE lab or LabCorp to conduct a substrate control test in this case affected the validity or reliability of the test results, and did not advise counsel that a description of the biological substance on the defendant’s underwear as blood was scientifically inaccurate or misleading.
Notwithstanding counsel’s retention of a confidential DNA expert, who reviewed the State’s results prior to the stipulation, Crain contends that counsel was ineffective for failing to challenge the State’s circumstantial case, and more specifically, the conclusion that the DNA substance matching Amanda’s DNA was blood without independent testing. After finding the testimony of trial counsel to be “very credible” and that Crain’s stipulation at trial was entered into with his full knowledge and consent, the postconviction court determined that Crain failed to establish that trial counsel performed deficiently in stipulating to the DNA evidence as blood or in failing to challenge the DNA evidence or to request that independent testing be conducted in this case. In making this determination, the postconviction court noted that trial counsel considered alternative courses of action and then made a reasonable strategic decision for the stipulation and for not challenging the evidence or requesting an independent analysis. We accept the postconviction court’s findings as supported by competent, substantial evidence. See Parker v. State, 8 So.3d 974, 980 (Fla.2009) (“As long as the trial court’s findings are supported by competent substantial evidence, this Court will not substitute its judgment for that of the trial court on questions of fact, likewise of the credibility of the witnesses....” (quoting Blanco v. State, 702 So.2d 1250, 1252 (Fla.1997))).
*1037 As we have routinely stated, “strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel’s decision was reasonable under the norms of professional conduct.” Patton v. State, 878 So.2d 368, 373 (Fla. 2004) (quoting Occhicone v. State, 768 So.2d 1037, 1048 (Fla.2000)). Prior to entering into the stipulation, counsel considered attacking the validity of the DNA evidence by retaining a confidential expert. When the expert failed to provide counsel with a basis for questioning the State’s test results, the defense sought to establish an innocent, plausible explanation for the presence of blood found on Crain’s boxer shorts and inside his bathroom. Not only was this a reasonable alternative course in light of the retained expert’s conclusions, but this decision was also consistent with Crain’s prior statements to the media, Crain’s continued insistence that if blood was found inside his bathroom or on his clothes, it was due to Amanda’s loose tooth, and Crain’s testimony to this effect at trial. Cf Carroll v. State, 815 So.2d 601, 613 & n. 14 (Fla.2002) (concluding that trial counsel’s decision not to retain a DNA expert was reasonably strategic where counsel spoke with several DNA experts in preparation for dealing with the DNA evidence, the DNA evidence “was pretty solid,” the FBI lab was under no scrutiny at the time, and counsel sought to exclude the evidence during trial and testified that the retention of an expert would have done the defendant a disservice). Moreover, when the trial judge questioned Crain about this stipulation at trial, he acknowledged that his agreement with it was not coerced. Under these circumstances, we conclude that counsel’s decision to stipulate to the DNA evidence as being derived from blood was not deficient; rather, the record supports the conclusion that it was a well-informed and strategic decision made after consulting an expert and considering alternative courses of action.
Even if we were to assume that counsel’s performance was deficient, Crain cannot establish prejudice under Stride-land. It has never been contested whether the DNA found on Crain’s boxer shorts and inside his bathroom matched Amanda’s DNA; rather, Crain’s postconviction claim is predicated only upon counsel’s decision to stipulate that the DNA was blood. In essence, Crain alleges that if counsel had not entered into the DNA stipulation and had adequately investigated ways in which to challenge the State’s DNA evidence, the jury would have heard testimony to the effect that the DNA could have been derived from a variety of sources, not just blood, and that possible problems with the handling of the DNA evidence during testing existed.
During the evidentiary hearing, Crain’s sole expert on this issue, Dr. Elizabeth Johnson, testified that presumptive blood testing, like the testing Dr. Yeshion performed on the DNA evidence in this case, does not conclusively establish that the source of DNA is blood. Dr. Johnson explained that substrate control testing, which Dr. Yeshion did not undertake in this case, would have eliminated the possibility that the DNA was derived from a source other than blood, such as saliva, tears, nasal or vaginal secretions, or urine. She also testified as to her concerns regarding possible cross-contamination, but because more recent testing of the items did not yield any favorable results, Dr. Johnson could not say whether the DNA’s source was anything other than blood. Based on the information provided to her, Dr. Johnson finally testified that she was unable to “evaluate whether there was or wasn’t contamination.”
*1038 At the evidentiary hearing, Dr. Yeshion defended his use of the phenolphthalein presumptive test and noted that in his thirty-five years of using that test, he had not found “anything other than blood that reacts to the phenolphthalein test when used in the proper sequence” and had no real problem “going right to DNA and saying that the DNA [he was] obtaining is a DNA result because of the biological evidence which is identified through phenolphthalein and believed to be blood.” Dr. Yeshion also explained that the proper safety protocols were in place to detect and avoid cross-contamination and that there was no indication that contamination occurred in this case. Dr. Martin Tracey, a DNA analyst and an expert in the field of population genetics presented by the State, testified that in the late 1990s, very few labs implemented substrate control testing, that such controls were not recommended as being necessary at the time, and that he was unaware of any guidelines requiring the use of substrate controls for forensic DNA analysis to be considered reliable. Dr. Tracey further noted that the lack of substrate control testing did not affect the results in this case.
In analyzing prejudice, the postconviction court determined that the State’s experts, Drs. Tracey and Yeshion, were credible and found Dr. Johnson’s testimony to be “essentially credible” but that much of it was “based on mere speculation.” These findings are supported by competent, substantial evidence. Dr. Johnson was unable to testify that despite Dr. Yeshion’s failure to use conclusive blood testing, the source of the DNA evidence in this case was derived from anything other than blood or that cross-contamination actually occurred. On the other hand, Drs. Yeshion and Tracey found no problems with the DNA testing conducted in this case. The postconviction record does not disclose any definitive evidence of invalid or even questionable DNA test results, and therefore Crain has failed to demonstrate prejudice.
Because Crain has established neither deficiency nor prejudice, we deny relief on this claim.[8]
Failure to Retain a Rebuttal Expert
Crain next argues that trial counsel were ineffective for failing to retain an independent expert to challenge the testimony elicited from the State’s expert, Dr. Russell Vega, a forensic pathologist who rendered an opinion as to the origin of certain scratch and gouge marks appearing on Crain’s body following Amanda’s disappearance.
To place this claim in context, at trial it was revealed that during police questioning of Crain on September 11,1998, Detective A1 Bracket noticed multiple scratch marks on Crain’s arms and asked Crain how he received them. Crain claimed that the scratches occurred while he was lifting crab traps, but Crain became defensive when Bracket asked him to demonstrate how the scratch marks were inflicted. Thereafter, several photographs of Crain’s body were taken. To interpret the origin of these scratch marks as depicted in the photographs, the State presented the testimony of Dr. Vega. On direct examination, Dr. Vega testified that Crain’s scratch marks were probably inflicted within a few hours to a day before the photos were taken, but he could not identify the origin *1039 of the scratch marks with any certainty. In his opinion, all but two of the scratch marks were “consistent with” having been caused by the fingernails of a seven-year-old child and one cluster of three scratch marks was “somewhat more likely” to have been caused by fingernails than those depicted in the other photographs. He further opined that one cluster of small gouges on Crain’s arm was “somewhat suggestive of ... having been caused by a small grasping hand” with spacing consistent with the hands of a seven-year-old child.
Dr. Vega made considerable concessions on cross- and redirect examination. On cross, Dr. Vega conceded his inability to reach any conclusion or opinion as to whether Crain’s scratches or wounds were caused by human fingernails. The doctor admitted that the cause of the scratches would also be consistent with crab traps, mechanisms with wire meshing, and to a lesser extent, bushes, twigs, or things of that nature, as well as other innumerable inanimate objects. Based on cross-examination questions, Dr. Vega emphasized that he was unable to narrow down that any two of the scratches occurred at exactly the same. time. Finally, on redirect, Dr. Vega admitted that he could not reach an opinion within a reasonable degree of medical certainty as to the origin of Crain’s injuries.
In support of this claim, postconviction counsel called Dr. Ronald Wright, another forensic pathologist, to show the type of expert opinion that trial counsel could have presented during the guilt phase. In Dr. Wright’s view, some of Crain’s injuries were “quite old” and made at least several days before the photographs were taken; some were “basically inconsistent with fingernail scratches, unless somebody had [his or her] fingernails cut into a V so that you would have a very narrow fingernail mark”; and the scratch marks depicted in two of the photographs were the only injuries that could not be excluded as fingernail marks even though they lacked “the characteristic curvilinear feature.” However, Dr. Wright also acknowledged the following: he did not disagree with Dr. Vega’s written report[9] concerning the scratch marks; his own opinion was in accord with the opinions expressed in Dr. Vega’s report; Dr. Vega did not mislead the jury as to the nature or limitations of his opinion; he did not have any “real problems with” Dr. Vega’s testimony because “at least a couple of’ the scratch marks could have been caused by fingernails; he could not rule out the possibility that fingernails caused Crain’s scratch marks, only that it was, in his view, unlikely; and he agreed that there was nothing outside the permissible mode of expression within forensic pathology for Dr. Vega to give his opinion that Crain’s scratch marks were consistent with human fingernails. In fact, Dr. Wright’s main criticism of the trial testimony appeared to be that counsel never asked Dr. Vega whether his opinion was based upon a reasonable degree of medical certainty, but the trial record indicates that on redirect, Dr. Vega stated that his opinion was not within a reasonable degree of medical certainty.
At the evidentiary hearing, trial counsel explained the reason for choosing not to retain an expert to challenge Dr. Vega’s conclusions. According to counsel, before trial, the defense deposed Dr. Vega, during which Dr. Vega’s assessment of the cause of the scratch marks was equivocal — they could have been caused by fingernails but could have also been caused by a variety of other objects consistent -with Crain’s occu *1040 pation as a crabber. In his deposition testimony, Dr. Vega admitted that he was unable to reach any conclusions as to the precise origin of the scratch marks, which he later admitted at trial. Based on the nature of Dr. Vega’s deposition testimony, counsel did not recall contemplating the retention of an expert to rebut Dr. Vega’s findings because the doctor’s testimony was not damaging.
In denying this claim, the postcon-riction court found trial counsel’s testimony to be credible and that counsel’s actions in not retaining an expert for the guilt phase were based on a reasonable strategic decision. While Crain contends that his trial counsel should have further challenged Dr. Vega’s testimony through the use of a defense expert, the United States Supreme Court has recognized that “Strickland ... permits counsel to ‘make a reasonable decision that makes particular investigations unnecessary.’” Harrington v. Richter, — U.S. -, 131 S.Ct. 770, 788, 178 L.Ed.2d 624 (2011) (quoting Strickland, 466 U.S. at 691, 104 S.Ct. 2052); see id. at 789 (acknowledging that “it would be well within the bounds of a reasonable judicial determination for the state court to conclude that defense counsel could follow a strategy that did not require the use of experts regarding” a challenge to the prosecution’s blood evidence).
In the present case, Crain cannot establish deficient performance for failure to retain an expert witness when trial counsel made a reasonable decision to confront and challenge the State’s own witness at trial through cross-examination, particularly since counsel deposed the State’s expert in advance of trial and, while doing so, obtained significant concessions regarding the nature of the scratch-marks testimony. See Smithers v. State, 18 So.3d 460, 470-71 (Fla.2009) (concluding that trial counsel’s decision to rely solely on cross-examination of State’s expert was reasonable since expert’s testimony was consistent with the defense’s argument); Belcher v. State, 961 So.2d 239, 250-51 (Fla.2007) (holding that it was a reasonable strategic decision for trial counsel to decline retaining an expert to rebut the State’s expert when at trial, counsel rigorously challenged the State’s expert and attempted to confront the evidence not through a defense expert, but by vigorously challenging the State’s expert at trial).
Standing alone, Dr. Vega’s testimony on direct examination would have been highly unfavorable to the defense. However, trial counsel vigorously attacked Dr. Vega’s testimony on cross-examination by obtaining a concession that he was unable to reach a definitive conclusion regarding whether Crain’s scratches were caused by human fingernails, that Crain’s injuries were also consistent with being caused by objects associated with Crain’s profession as a crabber, and that he could not determine if all of Crain’s injuries occurred simultaneously. Dr. Vega also acknowledged that his opinion was not within a reasonable degree of medical certainty. Dr. Vega’s trial testimony was consistent with his deposition testimony that trial counsel obtained prior to trial.
As the United States Supreme Court has recently recognized, “Strickland does not enact Newton’s third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense” because “[i]n many instances cross-examination will be sufficient to expose defects in an expert’s presentation.” Harrington, 131 S.Ct. at 791. In accord with that logic, the record is clear that in the present case, trial counsel deposed Dr. Vega before trial, and during that deposition, counsel obtained significant concessions. Thereafter, trial *1041 counsel made a reasonable strategic decision to attack the scratch-marks evidence not through the use of a rebuttal expert, but rather through a comprehensive challenge of the State’s expert. Thus, Crain cannot premise his ineffectiveness claim on trial counsel’s reasonable strategic decision made after deposing the State’s expert.
Even if we were to assume deficiency, Crain has not demonstrated prejudice. While it is true that Dr. Wright opined that it was unlikely fingernails caused Crain’s scratch marks, he was also unable to rule fingernails out as a cause of the scratch marks. Additionally, Dr. Wright admitted that he had no “real problems” with Dr. Vega’s trial testimony because in his view, several of the scratch marks could have been caused by fingernails and it was not unprofessional or outside the normal permissible mode of expression within forensic pathology for Dr. Vega to indicate that Crain’s scratch marks were consistent with being caused by human fingernails. Moreover, Dr. Vega even acknowledged at trial that he could not narrow down whether any two of the injuries occurred at exactly the same time.
In support of prejudice, Crain further alleges that during guilt-phase closing arguments, the prosecutor improperly blurred the distinction between the cause of his scratch marks as being “consistent with” fingernails and actually being “caused by” fingernails with the following statements:
The Prosecutor: Let me show you State’s Exhibit No. 31, which are the gouge marks, they’ve been described as gouge marks, four of them; three and then a thumb.
And you can see them there, I’m gonna tilt the picture, one, two, three and down here a thumb. Dr. Vega said they are suggestive of a little girl’s fingernails; because of the parallel nature and the spacing, it’s consistent with the fingernails of a seven year old girl.
And when you look at these injuries and you look at the hand of Amanda Brown, you can vision, you can see her fingernails digging into this man’s elbow as she fought for [her] life — as he took her life in that bathroom.
You can see it in this picture. You can see the claw that she’s scratching with, all of 45 pounds against this man. State’s 32(A), three more parallel scratches.
Can Dr. Vega rule these out as coming from any other source? Absolutely not. But look at them in the context, ladies and gentlemen, there’s another three coming down the back of the arm occurring roughly the same time, according to Dr. Vega, as the gouge on the elbow.
(Emphasis added.) Contrary to Crain’s contention, the prosecutor’s statements regarding Crain’s scratch marks were fair comments based upon Dr. Vega’s testimony, and thus no prejudice resulted. See Wade v. State, 41 So.3d 857, 869 (Fla.2010) (“The proper exercise of closing argument is to review the evidence and to explicate those inferences which may reasonably be drawn from the evidence.” (quoting Bertolotti v. State, 476 So.2d 130, 134 (Fla.1985))), cert. denied, — U.S. -, 131 S.Ct. 1004,178 L.Ed.2d 835 (2011).
Crain also cites to this Court’s discussion of Dr. Vega’s testimony throughout its direct-appeal decision to support his prejudice claim, see Crain, 894 So.2d at 65, 72, 74-75, specifically noting “this Court’s repeating of the State’s keen emphasis on the scratch marks upon direct appeal.” Considering the testimony of Dr. Vega at trial and comparing it with the testimony that Crain now offers through Dr. Wright, the differences are not so substantial so as *1042 to undermine our confidence in the outcome of Crain’s guilt-phase proceeding. Moreover, our references to Dr. Vega’s testimony on direct appeal cannot be considered in isolation of our analysis of all the circumstantial evidence that points to Crain’s culpability for Amanda’s murder, which stands as strong evidence of his guilt.[10]
In light of the above, we affirm the postconviction court’s denial of relief on this claim.[11]
Penalty-Phase Investigation and Presentation
In his final ineffectiveness argument, Crain essentially raises two subclaims. He first argues that counsel failed to adequately investigate, prepare, and present available mitigation. Crain also contends that counsel failed to supervise the administration of available mental health tests and provide a competent expert psychological evaluation and testimony. Crain generally alleges that these deficiencies prejudiced his penalty-phase proceeding. For the reasons that follow, we deny relief on all aspects of this claim.
To properly address this claim, we first review the relevant testimony. The trial record discloses that Dr. Robert Berland, a board-certified forensic psychologist and the defense’s sole penalty-phase expert, evaluated Crain in preparation for the penalty phase and testified at trial. During the penalty phase, Dr. Berland acknowledged that he administered to Crain the original versions, as opposed to more recent versions, of the Wechsler Adult Intelligence Scale (WAIS) and Minnesota Mul-tiphasic Personality Inventory (MMPI). Based on his MMPI testing, Dr. Berland found that Crain suffered from delusional paranoid thinking. Dr. Berland used the WAIS to assess impairment for brain injury, and the WAIS indicated that Crain was not mentally retarded and had an overall IQ of 85. In Dr. Berland’s view, Crain was psychotic, and he also had some reason to believe that Crain suffered from impaired functioning due to brain injury. Dr. Berland further opined that at the time of his offense, Crain suffered from an extreme mental or emotional disturbance and that Crain’s capacity to conform his conduct to the requirements of law was substantially impaired. At trial, the State’s clinical and forensic psychiatric expert, Dr. Barbara Stein, disagreed with Dr. Berland’s assessment and criticized his use of the original WAIS because it was outdated and could not be used to evaluate brain injury. The jury unanimously recommended a sentence of death.
*1043 During postconviction proceedings, Dr. Berland explained the purpose behind using original versions of the WAIS and MMPI. According to Dr. Berland, Crain’s intelligence was not an issue, and he was more concerned with preliminary evidence of brain injury. Consequently, Dr. Ber-land utilized the original WAIS, which neu-ropsychological research indicated was a better measure of impairment from brain injury than the test’s subsequent versions. Dr. Berland also explained that the original and second editions of the MMPI were now proven to be clinically and statistically equivalent and a larger research history supported using the original MMPI at the time of Crain’s trial. Further, during the penalty phase, Dr. Berland testified consistent with his postconviction testimony regarding his use of the original WAIS. At trial, he stated that the original WAIS was a better measure of impairment for brain injury and had a multitude of research dating back to 1950 supporting its usage for such an assessment. Dr. Berland also testified that the revised and third editions of the WAIS had considerably less research supporting their use in this regard.
At the evidentiary hearing, trial counsel testified to being aware of Dr. Berland’s use of the original versions of the tests and acknowledged that the State’s penalty-phase expert disagreed with the validity of Dr. Berland’s testing procedures. However, counsel recalled the following: no one definitively established whether the tests used were outdated; Dr. Berland was comfortable using such tests and found them to be legitimate assessment tools; and Dr. Berland had been a doctor for a long period of time and was regarded as being good at his profession.
In denying this claim, the postconviction court determined that counsel did not render deficient performance, and in doing so, made extensive findings of fact and credibility:
First, the Court finds the testimony of both Dr. Berland and [trial counsel] to be credible. Consequently, the Court finds counsel did not perform deficiently for failing to establish evidence of Defendant’s brain damage through neurop-sychological testing. Defense counsel made a strategic decision to obtain evidence of brain damage through PET scan testing and when that failed, to present the testimony of Dr. Berland. [Trial counsel] also relied on the opinion and recommendation of his expert, Dr. Berland. The Court further finds Defendant has failed to show counsel performed deficiently for presenting the testimony of Dr. Berland during the penalty phase. Dr. Berland explained his reasons for using the older versions of the WAIS and MMPI and adequately expressed his opinions and the bases for those opinions; [trial counsel] was not ineffective for relying on Dr. Berland’s evaluations and opinions. See Darling v. State, 966 So.2d 366, 377 (Fla.2007) (“This Court has established that defense counsel is entitled to rely on the evaluations conducted by qualified mental health experts, even if, in retrospect, those evaluations may not have been as complete as others may desire.”); Sexton v. State, 997 So.2d 1073, 1085 (Fla.2008) (“The fact that Dr. McCraney [postconviction expert], some seven years later, disagreed with the extent or type of testing performed, or the type of mitigation presented, does not mean that trial counsel was deficient at trial.”). Additionally, much of the information provided by Dr. [Mark] Cunningham was cumulative where Dr. Berland informed the jury about Defendant’s alcohol and substance abuse, his history of psychiatric care and counseling, good behavior in prison, unstable home life, substantial physical, sexual and emotional abuse during childhood, witnessing of disturbing sex, and lack of education and *1044 social training. See 966 So.2d at 377 (“[T]his Court has held that even if alternate witnesses could provide more detailed testimony, trial counsel is not ineffective for failing to present cumulative evidence.”). Consequently, the Court further finds trial counsel performed a reasonable investigation into Defendant’s mental health and background as required. See Strickland v. Washington, 466 U.S. 668, 691 [104 S.Ct. 2052, 80 L.Ed.2d 674] (1984) (“[CJounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.”). As such, Defendant has failed to show counsel performed defi-ciently under Strickland.
After reviewing the sentencing order, which found three aggravating circumstances and various nonstatutory mitigation circumstances,[12] noting the jury’s unanimous recommendation, and considering the additional mitigating testimony presented during the evidentiary hearing, the postconviction court further found that there was no prejudice.
On appeal, Crain essentially challenges the postconviction court’s credibility determinations and, more specifically, the weight given to Dr. Berland’s testimony. However, this Court is “highly deferential to the trial court’s judgment on the issue of credibility,” Archer v. State, 934 So.2d 1187, 1196 (Fla.2006), and in “evaluating a trial court’s order, 'this Court will not substitute its judgment for that of the trial court on ... the credibility of the witnesses ... ’ provided its order is supported by competent, substantial evidence,” Cherry v. State, 959 So.2d 702, 709 (Fla.2007) (quoting Porter v. State, 788 So.2d 917, 923 (Fla.2001)).
After having reviewed both the trial and evidentiary hearing testimony, we conclude that the postconviction court’s findings are sufficiently supported by the record. Although Dr. Stein and Dr. Mark Cunningham, two other experts who testified during postconviction proceedings, disagreed with Dr. Berland’s opinions and the type of testing Dr. Berland conducted pri- or to and in preparation for the penalty phase, the postconviction court found that Dr. Berland adequately explained the basis for his evaluations and opinions and found his testimony to be credible. Therefore, counsel were not ineffective for relying on Dr. Berland’s assistance, “even if, in retrospect, [his] evaluations may not have been complete as others may desire.” Darling, 966 So.2d at 377. Accordingly, we affirm the postconviction court’s denial of relief on all aspects of this claim.[13]

Jury Interview Rules

Lastly, Crain argues that rule 4 — 3.5(d)(4) of the Rules Regulating the *1045 Florida Bar and Florida Rule of Criminal Procedure 3.575, which place restrictions on post-trial jury interviews by attorneys, unconstitutionally deny him the right to effective assistance of counsel in pursuing his postconviction remedies. This Court has repeatedly rejected similar constitutional challenges to these rules. See, e.g., Floyd v. State, 18 So.3d 432, 459 (Fla.2009) (rejecting claim that rule 4-3.5(d)(4) violated due process rights as well as the First, Sixth, Eighth, and Fourteenth Amendments); Barnhill v. State, 971 So.2d 106, 117 (Fla.2007) (“We deny relief on this issue consistent with our prior decisions which have found that rule 4-3.5(d)(4) and rule 3.575, which collectively restrict an attorney’s ability to interview jurors after trial, do not violate the defendant’s constitutional rights.”). We also note that “juror interviews are not permissible unless the moving party has made sworn allegations that, if true, would require the court to order a new trial because the alleged error was so fundamental and prejudicial as to vitiate the entire proceedings,” Green v. State, 975 So.2d 1090, 1108 (Fla.2008) (quoting Johnson v. State, 804 So.2d 1218, 1225 (Fla.2001)), and there is no evidence that Crain made such a request in this case. Accordingly, we affirm the postcon-viction court’s denial of this claim.
CONCLUSION
For the reasons set forth above, we affirm the postconvietion court’s denial of relief.
It is so ordered.
CANADY, C.J., and PARIENTE, LEWIS, QUINCE, POLSTON, LABARGA, and PERRY, JJ., concur.

. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.

. In our direct appeal decision, Dr. Vega's testimony was characterized in the following manner:
A forensic pathologist testified at trial that the scratches on Crain’s arms probably occurred within a few hours to a day before the photos were taken. Although the pathologist could not identify the source of the scratches with certainty, he testified that all but two of the scratches were more likely to be caused by the fingernails of a seven-year-old child than by another cause. The pathologist also testified that there was one cluster of small gouges on Crain's arm, and it was more likely that these gouges were caused by the small grasping hand of a child of about seven years of age than by another cause.
Crain, 894 So.2d at 65. We now clarify that any statement in our direct appeal decision to the effect that the marks on Crain’s body were “more likely” caused by the hand or fingernails of a seven-year-old child "than by another cause” was a mischaracterization of Dr. Vega’s trial testimony. Dr. Vega never drew such a strong correlation between the marks and their apparent cause. Rather, Dr. Vega acknowledged that the marks on Crain’s body were "consistent” with having been caused by the fingernails or with the hand spacing of a seven-year-old child, but were also consistent with having been caused by other objects.

. In contrast to the jury instruction on count I, which related to the murder charge and instructed the jury on alternative theories of kidnapping, on count II, the jury was not instructed on the unpled alternative of kidnapping with intent to inflict body harm. Id. *1033 at 75. Thus, on appeal, when examining whether the evidence was legally sufficient to support a separate conviction for kidnapping as charged in count II of the indictment, this Court concluded that competent, substantial evidence did not exist to support the jury verdict of kidnapping with the intent to commit homicide. Id. at 76. As to count I, however, we held that there was sufficient evidence to support a felony murder conviction under the alternative theory of kidnapping with the intent to inflict bodily harm. Id. at 73-74.

. Crain raised the following postconviction claims: (1) counsel rendered ineffective assistance by failing to challenge the State's circumstantial case as to the introduction of DNA evidence; (2) counsel rendered ineffective assistance by failing to seek the exclusion of photos of scratches on Crain’s body on the basis that such photos were obtained pursuant to an unconstitutional search; (3) counsel rendered ineffective assistance by failing to retain a defense expert to challenge the testimony of the State’s medical expert who testified regarding scratch-mark evidence presented at the guilt phase; (4) counsel rendered ineffective assistance for failing to provide a competent psychological evaluation and testimony, to adequately investigate, prepare, and present available mitigation, and to otherwise challenge the State’s case for the death sentence; (5) counsel rendered ineffective assistance by failing to effectively cross-examine several trial witnesses for the purpose of impeachment; (6) execution by lethal injection constitutes cruel and unusual punishment; (7) because Crain may be incompetent at the time of execution, his right against cruel and unusual punishment will be violated; (8) the rules prohibiting Crain's lawyers from interviewing jurors to determine if error occurred are unconstitutional and deny Crain adequate assistance of postconviction counsel; and (9) cumulative error occurred.

. Since we conclude that Crain’s individual claims are without merit, we likewise deny his claim that cumulative error occurred in this case. See Israel v. State, 985 So.2d 510, 520 (Fla.2008).

. Dr. Elizabeth Johnson testified at the evi-dentiary hearing that “substrate control” testing is the testing of an area from a piece of cloth as close as possible to the visible presumed bloodstain, but which is not stained itself, to determine whether there is an overlay or superimposition of invisible biological material in that area that would give a DNA profile from a source other than blood.

. At the evidentiary hearing, trial counsel recalled that in trying to defend against the State’s DNA case, they had to confront Crain’s prior statements to a local reporter, Warren Eli, and the producers of a national talk show that Amanda's tooth was loose on the night she visited and that this may have been the source of Amanda's blood. Counsel testified that he reviewed the tape of the talk show, and Crain continued to insist that if there was blood in his bathroom or on his clothes, it was a result of Amanda having a loose tooth. According to counsel, Crain reiterated his pretrial insistence that any blood DNA from Amanda was a result of her loose tooth rather than the result of a murder.

. To the extent Crain argues that counsel were ineffective for failing to object to comments made by the prosecutor during closing argument and for ineffectively responding to the prosecutor's misstatement of the evidence, these claims are procedurally barred because they were not raised below. See Green v. State, 975 So.2d 1090, 1104 (Fla.2008). We further conclude that they are without merit.

. The record does not reflect that Dr. Vega’s written report was ever entered into evidence during either the trial or postconviction proceedings.

. As recognized in footnote 2 of this opinion, any statement we made to the effect that the marks on Crain's body were "more likely" caused by the hand or fingernails of a seven-year-old child "than by another cause” should have been more accurately stated as being "consistent” with those conclusions.

. Crain asserts in the alternative that counsel’s failure to retain a rebuttal expert rendered them ineffective per se under the standard articulated in United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). We reject this claim because the "Cronic standard is reserved for situations where the assistance of counsel has been denied entirely or withheld during a critical stage of the proceeding such that the ‘likelihood that the verdict is unreliable is so high that a case-by-case inquiry is unnecessary.’ ” Chavez v. State, 12 So.3d 199, 212 (Fla.2009) (quoting Mickens v. Taylor, 535 U.S. 162, 166, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002)). In this case, because counsel was never denied, Crain cannot rely on the per se rule from Cronic to avoid establishing prejudice; the record reflects that counsel was present during Dr. Vega's testimony and conducted a thorough cross-examination of the State’s expert witness.

. At sentencing, the trial court found the following nonstatutory mitigating circumstances, assigning to each various weight: (1) although the trial court was not reasonably convinced Crain was psychotic or had a brain injury, the trial court found Crain was an uncured pedophile, that his mental health was impaired, and that his mental health problems were exacerbated by the use of alcohol and drugs (some weight); (2) Crain was intoxicated at the time of the offense (some weight); (3) Crain had a history of extensive abuse (some weight); (4) Crain had a history of abuse and an unstable home life (modest weight); (5) Crain was deprived of educational benefits and social learning that one would normally obtain from public education (modest weight); (6) Crain experienced depression and suicidal ideation in the months leading up to his arrest (little weight); (7) Crain had a history of hard, productive work (some weight); (8) Crain had a good prison record (modest weight); and (9) Crain had the capacity to form loving relationships (modest weight).

. Crain also contends that counsel failed to secure and present available mitigation. However, Crain has neither identified nor argued for any mitigating evidence that should *1045 have been, but was not, presented at trial. Because Crain has failed to identify any source of potential mitigation in support of this argument, we conclude that Crain’s bare subclaim has been waived for the purposes of appeal. See Pagan v. State, 29 So.3d 938, 957 (Fla.2009) (“The purpose of an appellate brief is to present arguments in support of the points on appeal. Merely making reference to arguments below without further elucidation does not suffice to preserve issues, and these claims are deemed to have been waived.” (quoting Duest v. Dugger, 555 So.2d 849, 852 (Fla.1990))); see also Doorbal v. State, 983 So.2d 464, 482 (Fla.2008).